THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
*v.* LEO NEBBIA, Appellant.

(Argued June 13, 1933; decided July 11, 1933.)

*Arthur E. Sutherland, Jr.*, for appellant.

*John J. Bennett, Jr., Attorney-General (Henry S. Manley, Henry Epstein* and *Smith O'Brien* of counsel), for respondent.

POUND, Ch. J. This case comes before the Court of Appeals on appeal from a judgment of the Monroe County Court which affirmed a conviction of the defendant-appellant, Leo Nebbia, in the City Court of Rochester, Criminal Branch. (Code Crim. Pro. § 520.) The offense charged in the information was a sale by Mr. Nebbia of two one-quart bottles of milk and a loaf of " Italian bread " for eighteen cents, which is conceded to be a violation of section 312, subdivision (e), of the Agriculture and Markets Law (Cons. Laws, ch. 69), inasmuch as the Milk Control Board had fixed a minimum price for milk of nine cents per quart.

This act (Laws of 1933, ch. 158) was adopted after a thorough legislative investigation of the conditions under which milk was produced in this State. It begins with a statement to the effect that the milk business is one affecting the public health and interest, and that an emergency exists. It provides as follows:

" § 300. Legislative finding; statement of policy. This article is enacted in the exercise of the police power of the state, and its purposes generally are to protect the public health and public welfare. It is hereby declared that unhealthful, unfair, unjust, destructive, demoralizing and uneconomic trade practices have been and are now carried on in the production, sale and distribution of milk and milk products in this state, whereby the dairy industry in the state and the constant supply of pure milk to inhabitants of the state are imperiled. That such conditions constitute a menace to the health, welfare and reasonable comfort of the inhabitants of the state. That in order to protect the well-being of our citizens and promote the public welfare, and in order to preserve the strength and vigor of the race, the produc-

tion, transportation, manufacture, storage, distribution and sale of milk in the state of New York is hereby declared to be a business affecting the public health and interest. That the production and distribution of milk is a paramount industry upon which the prosperity of the state in large measure depends. That the present acute economic emergency, being in part the consequence of a severe and increasing disparity between the prices of milk and other commodities, which disparity has largely destroyed the purchasing power of milk producers for industrial products, has broken down the orderly production and marketing of milk and has seriously impaired the agricultural assets supporting the credit structure of the state and its local governmental subdivisions. That the danger to the public health and welfare is immediate and impending, the necessity urgent and such as will not admit of delay in public supervision and control in accord with proper standards of production, sanitation and marketing. The foregoing statements of fact, policy and application of this article are hereby declared as a matter of legislative determination."

The act then (§ 301) defines the classes of persons with whose conduct it deals; principally as follows:

" ' Milk dealer ' means any person who purchases or handles milk within the state, for sale in this state, or sells milk within the state except when consumed on the premises where sold.

" ' Producer ' means a person producing milk within the State of New York."

Section 302 of the act then creates a Milk Control Board of three members, the Commissioner of Agriculture and Markets, the Commissioner of Health, and the Director of the Milk Control Board. Of these, the first two may designate deputies to perform their functions. A majority of the members of the Board carries the power to decide any question before the Board.

This Board is granted great powers by the act, which

ends, however (§ 319), on March 31, 1934, and is avowedly a mere temporary measure to meet an existing emergency.

(§ 312) The Board must fix by order the minimum wholesale and retail prices for milk handled within the State for fluid consumption, including the prices on sales by milk dealers to consumers; this includes dealers who run stores (unless the milk is consumed on the premises). In fixing the prices it must take into consideration the amount necessary to yield a " reasonable return " to the producer and the milk dealer.

It may similarly fix maximum prices if it sees fit. Section 304 gives rulings of the Board the force and effect of law.

(§ 308) The Board has power to issue or withhold a license, as a condition of continuance in business, to or from any milk dealer in the State. Certain classes it may or may not exempt from the license requirements — such as small dealers and " carry away " stores. No unlicensed dealer (unless exempted) may sell or buy milk, or handle milk previously handled in violation of the act.

(§ 308, subd. 3) The Milk Control Board may refuse, suspend or revoke a license (thereby putting the dealer out of business) if a dealer

(a) has been receiving from a producer shipments of milk in a course of dealing and then rejects a shipment " without reasonable cause;"

(b) has failed " without reasonable cause " to pay a milk bill to a producer;

(c) where the dealer has done an act " in demoralization of the price structure of pure milk;"

(d) where the dealer assigns for creditors, goes through bankruptcy, or has an execution returned unsatisfied against him;

(h) where the dealer fails to furnish information or keep records required by the board;

(k) where the licensee has violated any of the provisions of this article.

Section 306 gives the Board sweeping powers to examine all books and records to enable the Board to administer the act.

Besides the power given to the Board (by § 308) to enforce the act by barring from the milk business any person who fails to comply, there is provided by section 307 an additional criminal sanction. A violation of the article, or of a rule or order of the Board lawfully made, is made a misdemeanor, punishable by not more than a year's imprisonment, or not more than one hundred dollars fine or both. The Board may also proceed civilly at law, or may enjoin, without proof that a remedy at law does not exist.

The appellant not unfairly summarizes this law by saying that it first declares that milk has been selling too cheaply in the State of New York, and has thus created a temporary emergency; this emergency is remedied by making the sale of milk at a low price a crime; the question of what is a low price is determined by the majority vote of three officials. As an aid in enforcing the rate regulation, the milk industry in the State of New York is made a business affecting the public health and interest until March 31, 1934, and the Board can exclude from the milk business any violator of the statute or the Board's orders.

The fixing of minimum prices is one of the main features of the act. The question is whether the act, so far as it provides for fixing minimum prices for milk, is unconstitutional under New York Constitution, article 1, section 6, and United States Constitution, Fourteenth Amendment, in that it interferes with the right of the milk dealer to carry on his business in such manner as suits his convenience, without State interference as to the price at which he shall sell his milk. The power thus to regulate private business can be invoked only under special circumstances. It may be so invoked when the Legislature is dealing with a paramount industry upon which the prosperity of the entire State in large measure depends. It may not be

invoked when we are dealing with an ordinary business, essentially private in its nature. This is the vital distinction pointed out in *New State Ice Co.* v. *Liebmann* (285 U. S. 262, 277).

It is argued that the Supreme Court of the United States has definitely excluded the production and sale of food from the field of price regulation. This is not so. (*Wolff Packing Co.* v. *Court of Industrial Relations*, 262 U. S. 522, 538.) Even if it were true under normal conditions, the same might have been said of the regulation by law of rents. Yet when an emergency arose after the war, resulting in burdensome rental conditions, emergency rent laws, temporary in their nature, were upheld. (*Block* v. *Hirsh*, 256 U. S. 135.) The court in regard thereto held:

1. That the legislative declaration of facts affording the ground for the regulation was entitled to great respect and was confirmed by common knowledge.

2. That the exigency existing clothed the letting of buildings with a public interest so great as to justify regulation by law, while such exigency lasted.

3. That such regulation was justified as a temporary measure, even though it might not be a permanent change.

4. That, the end being legitimate and the means reasonably related to it, the wisdom of the means was not for the courts to pass upon.

As is conceded in the *Liebmann Case (supra)*, all businesses are subject to some measure of public regulation. This is true in an exceptional degree of the milk business. (*People* v. *Teuscher*, 248 N. Y. 454.) The question is as to whether the business justifies the particular restriction, or whether the nature of the business is such that any competent person may, conformably to reasonable regulation, engage therein.

The production of milk is, on account of its great importance as human food, a chief industry of the State of New York. (Manley, " Constitutionality of Regulating

Milk as a Public Utility," 18 Cornell Law Quarterly, 410; Cross, " Milk Control Law," N. Y. State Bar Assn. Bulletin, May, 1933; " Legislative Regulation of the New York Dairy Industry," 42 Yale Law Journal, 1259.) It is of such paramount importance as to justify the assertion that the general welfare and prosperity of the State in a very large and real sense depend upon it. The entire milk product cannot be sold locally. It must be sold to milk gatherers to be shipped to centers of population. Distributors buy the milk from the farmer. The purchaser is compelled to take what the shipper offers. The shipper offers a low rate at which milk cannot profitably be produced. The State seeks to protect the producer by fixing a minimum price for his milk to keep open the stream of milk flowing from the farm to the city and to guard the farmer from substantial loss. (*People* v. *Perretta*, 253 N. Y. 305.) Price is regulated to protect the farmer from the exactions of purchasers against which he cannot protect himself.

These conditions called for the appointment by the Legislature on March 10, 1932, of a special joint legislative committee known as the Pitcher Committee, " * * * to investigate the causes of the decline of the price of milk to producers and the resultant effect of the low prices upon the dairy industry and the future supply of milk to the cities of the State * * *."

This committee held public hearings, took testimony and made a report. It found that price-cutting had reduced the price to the producer below two cents the quart and below the cost of production. It said: " The production and distribution of milk in this state is a paramount industry and affects in a large measure the health and prosperity of the people of the state. It is the duty of the state to take such measures as are necessary and reasonable to preserve this vital industry.

" The financial situation of dairy farmers in the state is very serious and has grown increasingly critical during the period of the committee's investigation.

" The principal causes of the extremely low prices for milk are the unprecedented recession in business and the periodic increase in the number of dairy cows.

" The fluid milk industry is affected by factors of instability peculiar to itself which call for special methods of control.

" A State Milk Control Board with broad powers is required to deal with the present emergency in the fluid milk industry of the state."

Among the causes of low milk prices mentioned in this preliminary report were the following: " Unsettled market conditions have led to price wars among distributors which have caused reductions in retail and wholesale prices below the point justified by the supply and demand situation. Unfair and destructive trade practices have been more prevalent and more serious than usual in their effect upon the price structure."

It also found: " The fact that the larger distributors find it necessary to carry large quantities of surplus milk while the smaller distributors do not, leads to price-cutting and other forms of destructive competition, especially when the surplus is abnormally large. The small distributor can contract for his minimum requirements and depend upon emergency purchases when threatened with a shortage. The larger distributors can not do this since the same percentage deficiency in volume would involve quantities too great to be obtained on short notice. The result of this situation is that the smaller distributors who take no responsibility for the surplus, by purchasing their milk on the basis of the blended returns by the larger organizations, are in a position to undersell the larger distributors in the cities.

" Most of the surplus in the New York milk shed is carried by the Dairymen's League and the Sheffield Farms Company. Other dealers by selling all or nearly all their supply as fluid milk have been able to engage very generally in price-cutting which has repeatedly

forced the large retail distributors (Borden's and Sheffield Farms) to lower their prices so as to protect their business. Some means of control is urgently needed which will place all buyers of milk on an equal basis as to the cost of their milk which they purchase for sale in fluid form. Only in this way can prices be stabilized above the ruinous level of returns from butter and cheese, or the public be assured that the most efficient methods of distribution will prevail."

In one of the final conclusions of this preliminary report the committee found: " It is clear that the economic law of supply and demand cannot be relied upon either to insure the consumers of a continuous and adequate supply of pure and wholesome milk, or to prevent grave injury to this important industry and its possible disintegration."

It found as a remedy that a Board should have authority " to fix the prices to be paid by dealers for milk classified according to its use with proper differentials, and the retail and wholesale prices to be charged for fluid milk and cream."

The condition has given rise to scenes of violence and disorder in the attempt to organize so-called milk strikes as a protest against the low prices paid for milk. The result was the enactment of the law now under consideration. Concededly the Legislature cannot decide the question of emergency and regulation, free from judicial review, but this court should consider only the legitimacy of the conclusions drawn from the facts found.

We are accustomed to rate regulation in cases of public utilities and other analogous cases and to the extension of such regulative power into similar fields. Rents have been regulated to prevent the exactions of greedy landlords who would contend that their property was taken from them when they were deprived of the right to do what they would with their own. (*Block* v. *Hirsh*, *supra*; *Brown Holding Co.* v. *Feldman*, 256 U. S. 170.) Compensation has been provided for workmen injured by

the necessary risks of their employment although the common law cast the burden of such risks on the workman. (*Arizona Employers' Liability Cases*, 250 U. S. 400.) Preference to citizens in employment of laborers on public works has been upheld. (*Heim* v. *McCall*, 239 U. S. 175.) Prevailing rate of wages laws for workmen on municipal contracts have been upheld. (*Atkin* v. *Kansas*, 191 U. S. 207; *Austin* v. *City of New York*, 258 N. Y. 113.) Usury laws are of an ancient house. Tariffs for the protection of home industries are upheld. Sugar bounties have not been declared unconstitutional. (*United States* v. *Realty Co.*, 163 U. S. 427.) The rates of grain elevators (*Munn* v. *Illinois*, 94 U. S. 113) and cotton gins may be regulated. (*Frost* v. *Corporation Commission of Oklahoma*, 278 U. S. 515.) Rate fixing in the business of insurance has been upheld. (*German Alliance Ins. Co.* v. *Kansas*, 233 U. S. 389; *O'Gorman & Young, Inc.*, v. *Hartford Fire Ins. Co.*, 282 U. S. 251.) The regulation of wages of railroad employees has been sustained. (*Wilson* v. *New*, 243 U. S. 332.) The business of dealing in milk has been regulated so as to protect producers who must sell their produce on credit. (*People* v. *Perretta, supra.*) Commission merchants have been required to give bonds for honest accounting to prevent evils incident to the business of dealing in farm products. (*Payne* v. *Kansas*, 248 U. S. 112.)

Doubtless distinctions may be drawn, holdings to the contrary cited and false analogies pointed out. The right of private bargaining has been upheld to defeat child labor laws (*Adkins* v. *Children's Hospital*, 261 U. S. 525); to prevent the fixing of wages in industry by an arbitration board (*Wolff Packing Co.* v. *Court of Industrial Relations*, 262 U. S. 522); to invalidate a State law fixing the price of gasoline (*Williams* v. *Standard Oil Co.*, 278 U. S. 235); to prohibit the regulation of the price of theatre tickets by speculators (*Tyson* v. *Banton*, 273 U. S. 418); to invalidate a law to equalize prices

of milk throughout the State (*Fairmont Creamery Co.* v. *Minnesota*, 274 U. S. 1; cf. *Central Lumber Co.* v. *State of South Dakota*, 226 U. S. 157), and a statute to regulate the fees of an employment agent (*Ribnik* v. *McBride*, 277 U. S. 350, 356).

All these decisions are to be read in the light of surrounding circumstances. This case, for example, may be distinguished from the Oklahoma ice case (*New State Ice Co.* v. *Liebmann, supra*), holding that the business of manufacturing and selling ice cannot be made a public business, to which it bears a general resemblance. The New York law creates no monopoly; does not restrict production; was adopted to meet an emergency; milk is a greater family necessity than ice.

Classifications, however sharply defined, appear on closer study to be separated only by imaginary lines. Sentences in judicial opinions are misleading if taken out of their context and read as if they were the gist of the decision. Mechanical concepts of jurisprudence make easy a decision on the strength of seeming authority.

The United States Supreme Court has said that although the abuses which grow up in connection with a business may afford a reason for regulating it, this is not enough to justify the " destruction of one's right to follow a distinctly useful calling in an upright way." (*Adams* v. *Tanner*, 244 U. S. 590, 594.)

Doubtless the statute before us would be condemned by an earlier generation as a temerarious interference with the rights of property and contract (*Matter of Jacobs*, 98 N. Y. 98; *Lochner* v. *New York*, 198 U. S. 45); with the natural law of supply and demand. But we must not fail to consider that the police power is the least limitable of the powers of government and that it extends to all the great public needs; that constitutional law is a progressive science; that statutes aiming to establish a standard of social justice, to conform the law to the accepted standards of the community, to stimulate the

production of a vital food product by fixing living standards of prices for the producer, are to be interpreted with that degree of liberality which is essential to the attainment of the end in view (*Austin* v. *City of New York, supra*, p. 117); and that mere novelty is no objection to legislation (*People ex rel. Durham Realty Corp.* v. *LaFetra*, 230 N. Y. 429).

The State courts should uphold State regulation whenever possible. They should be clearly convinced that a statute is unconstitutional before they declare it invalid. (Cf. *Ives* v. *South Buffalo Ry. Co.*, 201 N. Y. 271, with *Arizona Employers' Liability Cases, supra;* also cf. *People ex rel. Rodgers* v. *Coler*, 166 N. Y. 1, with *Atkin* v. *Kansas, supra.*)

With full respect for the Constitution as an efficient frame of government in peace and war, under normal conditions or in emergencies; with cheerful submission to the rule of the Supreme Court that legislative authority to abridge property rights and freedom of contract can be justified only by exceptional circumstances and, even then, by reasonable regulation only, and that legislative conclusions based on findings of fact are subject to judicial review, we do not feel compelled to hold that the " due process " clause of the Constitution has left milk producers unprotected from oppression and to place the stamp of invalidity on the measure before us.

With the wisdom of the legislation we have naught to do. It may be vain to hope by laws to oppose the general course of trade. The English Parliament, unhampered by the limitations of a written constitution, adopted statutes which directly fixed, or empowered certain persons to fix, the prices of wine and coal. (6 Holdsworth's History of English Law, p. 346.) Yet it is said that " The growth of the capitalistic organization of all branches of industry will strengthen the tendency to allow prices to be determined simply by the relation of supply to demand." (Holdsworth, *supra.*)

We are unable to say that the Legislature is lacking in power, not only to regulate and encourage the production of milk, but also, when conditions require, to regulate the prices to be paid for it, so that a fair return may be obtained by the producer and a vital industry preserved from destruction. (Hamilton, " Affectation with Public Interest," 39 Yale Law Journal, 1089–1101.) The policy of non-interference with individual freedom must at times give way to the policy of compulsion for the general welfare.

The judgment should be affirmed.

O'BRIEN, J. (dissenting). Pursuant to the provisions of section 312, subdivision (b) of the Agriculture and Markets Law (Laws of 1933, chap. 158) the Milk Control Board, established under this statute, by order fixed the minimum price to be charged for milk by stores to consumers at nine cents a quart in bottles. By subdivision (e) of this section, sale at less than the minimum price so fixed is declared to be unlawful and no method or device, by combining the price of milk with another commodity, whereby milk is sold at a price less than the price fixed by the Board, shall be lawful.

Defendant, a retail grocer in Rochester, sold to a consumer for eighteen cents two bottles of milk and a loaf of bread. This device whereby the milk was sold at less than nine cents a quart constitutes a plain violation of the statute and the Board's order. No problem, except the validity of that part of the statute authorizing price-fixing and the order issued in pursuance thereof is before us.

Disregarding for the moment this legislation as founded upon an assumed emergency as that term is recognized by this court and the Supreme Court of the United States, and viewing it merely as if it were an enactment adopted during a time of normal prosperity, its conflict with section 6 of article I of the New York Constitution and

with the Fourteenth Amendment of the Federal Constitution is scarcely open to doubt. Of course the production, distribution and exchange of milk, in so far as public health may be protected and fraud prevented, are subject to the operation of the police power (*Polinsky* v. *People*, 73 N. Y. 65; *Fischer* v. *St. Louis*, 194 U. S. 361; *People ex rel. Lieberman* v. *Van De Carr*, 199 U. S. 552; *Bellows* v. *Raynor*, 207 N. Y. 389; *People* v. *Beakes Dairy Co.*, 222 N. Y. 416, 427; *People* v. *Perretta*, 253 N. Y. 305), but legislative authority in respect to sanitary regulation as an exertion of the police power may be and is " quite distinct from the power to fix prices." (*Tyson* v. *Banton*, 273 U. S. 418, 430.) A Minnesota statute similar in its nature to the one before us and branding as a crime the purchase for manufacture or sale of milk, cream or butter fat at a higher price in one locality than the price paid in another has been held to infringe the liberty of contract guaranteed by the Fourteenth Amendment. (*Fairmont Creamery Co.* v. *Minnesota*, 274 U. S. 1, 7.) In that case the opinion of the State court declared that dairying was perhaps the largest productive industry in Minnesota and held that the police power extended not only to public health and morals but also to guarding the welfare of a great industry. The Supreme Court, however, conceding that the real evil at which the statute was aimed was the payment of excessive prices by powerful buyers for the purpose of destroying competition and that the statute undertook to require every buyer to adhere to a uniform price fixed by a single transaction, reversed the State court and decided that such legislation was a clear infringement of private rights. Although milk production is a very important industry, the business of the grocer, " the dairyman," the butcher, the baker, the shoemaker and the tailor, as stated by the Supreme Court in *New State Ice Co.* v. *Liebmann* (285 U. S. 262, 277), bears no such relation to the public as to warrant its inclusion in the category of businesses charged with a

public use. Conceding that in New York as well as in Minnesota dairying is a business in which the prosperity of the entire State in large measure is involved, nevertheless it is a private business and the Supreme Court has decided that the production or sale of food cannot be subjected to legislative regulation on the basis of a public use. (*New State Ice Case, supra; Wolff Packing Co. v. Court of Industrial Relations*, 262 U. S. 522.) These decisions are founded upon interpretations of State statutes in times of peace and of course do not profess to construe the war power of Congress. Natural monopolies by which exorbitant charges might be inflicted upon the public and which, without governmental regulation, would be subject to arbitrary control by their owners are undoubtedly affected by a public use. However, neither in New York nor elsewhere can the milk business be so classified. The reasons for the enactment of this statute are not that charges are too high or that a monopoly exists but that they are too low and competition is too keen. The purpose is not to reduce the price but to raise it. This policy constitutes an inversion of all recognized methods of constitutional regulation of private business. Such a business may not be converted into public business by legislative fiat. (*Producers Transp. Co. v. Railroad Comm.*, 251 U. S. 228, 230; *People ex rel. Durham Realty Corp. v. LaFetra*, 230 N. Y. 429, 442.)

The points tendered in support of the validity of this enactment emphasize its transient duration and the legislative declaration of the existence of an emergency. Section 300 recites that the law is enacted in the exercise of the police power of the State and that its purposes generally are to protect the public health and public welfare. This legislative declaration is entitled to great respect but it is not conclusive on the courts. (*Block v. Hirsch*, 256 U. S. 135, 154.) "Happily for all, the fundamental guaranties of the Constitution can not be freely submerged if and whenever some ostensible jus-

tification is advanced and the police power invoked."
(*Adams* v. *Tanner*, 244 U. S. 590, 594, 595.) In so far
as any parts of this statute may fairly tend to promote
public health, they should and will be sustained, but the
mere recitation to .the effect that uneconomic trade
practices as conducted at the time of the passage of the
act imperil the supply of pure milk and constitute a
menace to health and that the danger is immediate and
impending does not justify price-fixing. Because the
statute rehearses that the present acute economic emer-
gency has broken down the orderly production and
marketing of milk, courts are not foreclosed from drawing
on common knowledge and common experience. The
markets are and, prior to the passage of this act, were
flooded with a plethora of wholesome milk. In *People
ex rel. Durham Realty Corp.* v. *LaFetra* (*supra*) the exist-
ence of danger to public health, safety and morals was
within the knowledge of every one. The legislative decla-
ration narrated notorious facts. When the rent legislation
was enacted, the housing emergency created by the absence
of construction was so acute and the extortion and oppres-
sion by landlords taking advantage of a dense population's
necessities were so brutal that more than one hundred
thousand dispossess proceedings which affected nearly a
half million human beings in the city of New York were
then pending. Profiteering and oppression had become
general. Public safety was imperiled by probable riots
growing out of resistance to evictions, public health was
endangered both by exposure to the elements and by
congestion in crowded tenements by those who would be
forced from more spacious habitations. Thus was pre-
sented, as truly described by Judge POUND in his opinion
in that case, " a problem of the utmost gravity, calamitous
in its possibilities " (p. 438). Inadequacy of housing facili-
ties in cities had become a matter of world wide concern
and of world wide knowledge.

In relation to the dairy industry, common knowledge
compels the courts to conclude that, instead of imminent

danger of impairment of public health, safety or morals, the real emergency is a commercial one arising in part from those factors which have contributed to the widespread business depression from which few if any of our inhabitants have been immune. To correct these conditions, resort to the drastic remedy of fining or imprisoning small retail storekeepers who insist upon their property right to contract for the sale of milk at a price satisfactory to themselves and their customers is not a valid exercise of the police power. To bargain for the exchange of goods is no less a property right than the lawful power to contract for the rendition of services (*Exchange Bakery & Restaurant, Inc.*, v. *Rifkin*, 245 N. Y. 260), and is protected by the Fourteenth Amendment. (*Fairmont Creamery Co.* v. *Minnesota, supra.*) If in fact the public health were endangered, a more rigid inspection of dairies and the revocation of licenses of those who failed to supply milk of the required standard of purity would constitute the obvious remedy. The special privilege conferred by this statute upon members of a particular class by increasing the price of their product at the expense of laborers, mechanics and all other members of society cannot be regarded as such a necessary or even fairly reasonable substitute remedy as to lie within legislative discretion and to warrant its sanction by the courts. The financial condition of the dairy farmer is and has been most distressing. The same is true respecting artisans, professional men and women, traders, laborers and members of every calling and occupation. Yet every one is aware that those who can afford to buy milk obtain a wholesome quality.

The police power, although "a dynamic agency, vague and undefined in its scope" (*People ex rel. Durham Realty Corp.* v. *LaFetra, supra*, p. 442), cannot rise superior to the Constitution. This great instrument of government is not a thing merely to be extolled in academic halls, to be the subject of juvenile orations and to be tolerated as innocuous only so long as its prohibitions are unnecessary

in practical ways. It is not quiescent, it is vibrant. It cannot become obsolete until the States vote to amend or repeal it. It was designed to safeguard not only life and liberty but also property rights in times of stress and suffering when dispairing and desperate majorities in good faith seek by forbidden methods to correct temporary evils which, serious and distressing as they are, will prove less harmful and enduring than would the subversion of our fundamental principles of government. If the effort manifested by this statute to regulate private contract by fixation of prices on a product which does not constitute a public use be sustained, then the police power is not only undefined but it is boundless. Its operation will extend to every trade and every occupation. Each citizen will become enmeshed in an inextricable tangle of bureaucracies such as are now so prevalent in foreign countries but utterly alien to our institutions. Liberty will cease to exist. Since the warning was sounded in *Matter of Jacobs* (98 N. Y. 98, 114, 115), the Constitution, which of course was never intended as a document of perfect rigidity, has yielded to reasonably flexible and prudent interpretations by conservatively progressive judges, but the time has not yet come when the courts of this State ought to surrender to the doctrine that governmental prefects, in times of peace and plenty, may supervise the rearing of cattle or the price of milk. Until the people, in whom reside all political power, decide to amend their constitutions, the provisions of section 6 of article I of the New York Constitution and the Fourteenth Amendment of the Federal Constitution prevent, as valid, the recognition of the price-fixing element of this statute.

The judgment of conviction should be reversed and the information dismissed.

CRANE, LEHMAN, HUBBS and CROUCH, JJ., concur with POUND, Ch. J.; O'BRIEN, J., dissents in opinion; KELLOGG, J., not sitting.

Judgment affirmed.