Argued March 11, affirmed April 2, 1952

# CHRISTIAN ET AL. v. LA FORGE

242 P. 2d 797

*John D. Williams,* Assistant Attorney General, of Portland, and *Leonard D. Alley,* of Portland, argued the cause for appellants. With them on the brief was George Neuner, Attorney General, of Salem.

No appearance for respondent.

TOOZE, J.

This is a suit for an injunction, brought by Sherman Christian, Clarence Townsend, and Clyde C. Haase, as members of and constituting the Oregon State Board of Barber Examiners, as plaintiffs, against Earl La Forge, as defendant. The trial court sustained defendant's general demurrer to the complaint, and a decree was entered dismissing the suit. Plaintiffs appeal.

Omitting formal parts, the complaint alleges:

"I.

"That the plaintiffs, Sherman Christian, Clarence Townsend and Clyde C. Haase, are duly appointed, qualified and acting members of, and constitute, the Oregon State Board of Barber Examiners, hereinafter referred to as the Board; that said Sherman Christian is President of the Board, Clarence Townsend is Vice-President of the Board, and Clyde C. Haase is Secretary-Treasurer of the Board.

"II.

"That the defendant, Earl La Forge, is a duly licensed barber and operates a barber shop at 222 S. W. Madison Street, in the City of Portland, Multnomah County, Oregon, under the assumed name and style of the New Square Deal Barber Shop.

"III.

"That pursuant to and in compliance with Chapter 198, Oregon Laws 1945, the Board on the 8th

day of June, 1950, duly declared, established and promulgated by its official order a minimum price schedule for barbering services to be performed in the County of Multnomah, State of Oregon; that said minimum price order thereafter became effective on July 1, 1950, and has remained, and is now, in full force and effect.

"IV.

"That a copy of said order establishing minimum prices in Multnomah County was printed and posted for public inspection in the office of the Secretary of the Board; that a printed copy of the duly declared, established and promulgated minimum price order was promptly mailed to each registered barber in Multnomah County, Oregon, and particularly to the defendant herein; that a copy of said printed order is attached hereto, marked Exhibit A and incorporated herein and made a part hereof the same as though set out at length herein.

"V.

"That since July 1, 1950, defendant, being then and now subject to the provisions of said law and order promulgated thereunder, has wilfully and deliberately violated, and is now violating, the same in the following particulars, to-wit:

"(a) By offering the barbering service and rendering barbering service of adult hair-cutting within the City of Portland, Multnomah County, Oregon, at the price of fifty cents ($0.50) which is twenty-five cents ($0.25) below the price set for adult's hair-cutting in said minimum price schedule, the same at all times during said period, and now, being seventy-five cents ($0.75).

"(b) By failing to post in a conspicuous place in defendant's barber shop a copy of said approved and promulgated minimum price schedule furnished by plaintiffs to defendant.

"VI.

"That plaintiffs, through their agents, have repeatedly notified defendant of his said violations,

and have demanded that defendant cease said violations; that defendant, well knowing the provisions of said order and that his acts as hereinabove alleged were and are in violation thereof and of the laws of the State of Oregon, has refused to cease said violations, and threatens to, and will, continue offering and rendering said services at said prices or lower, and will continue to refuse to post said minimum price schedule until and unless restrained therefrom by order of this court.

## "VII.

"Plaintiffs are informed, and believe, and therefore allege that said violation of said law and the order of the Board have been, and are, being committed with the deliberate intent and purpose of breaking down and destroying the administration of said law and order promulgated thereunder by the plaintiffs; that by defendant's said violations great hardship and damage is inflicted upon those barbers complying with the order; that continuation of said violations by defendant would inevitably disrupt the administration of said law and render impossible its enforcement by the plaintiffs, and cause irreparable injury to plaintiffs and members of the barbering profession; that it is particularly necessary that said violations cease as early as possible to prevent a price war among barbers and safeguard fair competition, to protect the health and safety of the public and to insure adequate sanitary facilities in the barbering profession; that it is essential that defendant be restrained at once from further violating said order.

## "VIII.

"That plaintiffs have no plain, speedy or adequate remedy at law; that unless a court of equity intervenes, obedience to said order cannot be enforced, as no other remedy is sufficiently expeditious to deter defendant before said irreparable damage is done; that said Board is expressly empowered by said statute to enforce said law and

its orders made pursuant thereto by injunctive relief.

"WHEREFORE plaintiffs pray for a decree of this court granting to these plaintiffs a temporary restraining order restraining the defendant from rendering barbering services in Multnomah County, State of Oregon, for prices below the minimum price schedule for barbering services reestablished by the Board on June 8, 1950, and effective on July 1, 1950, and from otherwise violating said order, and that at the final hearing of this suit said restraining order be made permanent, and for such other, further and different relief as to the court may seem just and equitable in the premises."

Defendant's demurrer reads as follows:

"Comes now the defendant and demurs to the complaint filed against him in the above-entitled suit, demurring thereto upon the ground [sic] that the same does not contain facts sufficient to constitute any cause of suit or action against him.

"In my opinion this demurrer is well founded in law, and the defendant, in the presentation thereof will contend that the legislative act mentioned and referred to in paragraph, or subdivision numbered III of said complaint, and the validity of which is necessary to a cause of suit for plaintiffs in this case, is void for the following reasons:

"(a) It contravenes the due process clause of the Fourteenth Amendment to the Constitution of the United States: and

"(b) It is an unlawful delegation of legislative authority, in violation of Art. IV, § 1, Art. III, § 1, and Art. I, § 21, of the Constitution of the State of Oregon."

Insofar as material to the discussion that is to follow, ch 198, Oregon Laws 1945, provides as follows:

"Section 1. The facts, policies and purposes herein set out hereby are declared as a matter of legislative determination, and the provisions and

regulations hereof are declared to be enacted in the interest of the public health, public safety and general welfare. The profession of barbering and the operation of barber shops hereby is declared to be affected with a public interest; that the fixing of minimum prices for services will stabilize the barber business, safeguard fair competition, promote adequate sanitary facilities and assure adequate inspection and supervision of barber shops, as provided by the laws and ordinances of this state, and will thereby tend to protect the health and safety of the public and protect barbers from inadequate means for complying with health and sanitary regulations. It further is declared that unfair, demoralizing and uneconomic competition and practices now exist in this state among barbers and barber shops, resulting in price cutting to the extent of limiting and preventing barbers from rendering safe and healthful service to the public by reducing the purchasing power of barbers in obtaining sanitary products and appliances required for health protection and safety in preventing transmission of disease. '' * * * * *

"Section 3. Whenever a scale of minimum prices for barber services shall have been suggested in writing by petition, signed and submitted to the board of barber examiners by at least 70 per cent of the licensed barbers in any county of this state, the board of barber examiners shall have power to approve, alter, reduce, amend or reject such scale of minimum prices so suggested by petition and to declare and establish for such county, by official order, the minimum prices for any and all work or service usually performed in barber shops. Before acting upon such petitions the board, within 30 days after such schedule is submitted, shall determine by investigation whether such suggested prices are reasonable and sufficient to enable barber shops in such district to operate in keeping with the purposes of this act in minimizing danger to the public health and safety incident to such work. In any

event, the board shall have the power and authority to determine reasonable minimum prices for barber services and in determining reasonable minimum prices the board shall take into consideration the necessary costs incurred in such district in maintaining barber shops in a clean, healthful and sanitary condition, and also the wages or commissions, or both, which customarily are paid to employes in barber shops in such district, and shall take into consideration any and all other facts and conditions affecting the barber profession in its relation to the public health and safety; provided, however, that before any scale of minimum prices for barber services shall be declared, established and promulgated for any such district or county, the board of barber examiners shall investigate and determine the facts as to whether or not it be deemed necessary that minimum prices be established for the protection of and minimizing the danger to the public health and safety.

"The board, after making such investigation, may fix by official order the minimum prices for all work usually performed in a barber shop. If the board after investigation, made either upon its own initiative or upon the petition or complaint of a representative group of barbers, find and determine that the minimum prices charged or so fixed are insufficient or more than sufficient to properly provide safe and healthful services to the public and keep the shops sanitary, then the board shall have authority to vary or re-fix the minimum prices for a barber's work in each such district in order to safeguard and protect the public health and safety.

"Section 4. All orders of the board establishing schedules of prices to be charged for barber services shall remain in force and effect for a period of one year after the date of the issuance and publication of any such order, and shall be renewed annually upon its anniversary date, unless rescinded, modified, altered or replaced by a new or different order, approved and promulgated by the

board upon its own initiative or upon the written petition or application of a representative group of barbers as in this act provided.

" * * * * *

" * * * * *

" * * * * *

"Section 8. The board may institute such actions in the courts of competent jurisdiction as may appear necessary to enforce compliance with any provision hereof, and to enforce compliance with any ruling, subpena or order of the board made pursuant to the provisions of this act and, in addition to any other remedy, may apply to any court of competent jurisdiction for relief by injunction.

"Section 9. The board of barber examiners hereby is vested with such general powers as are necessary for administering and enforcing this act, and the board may act as mediator and arbitrator in any controversy or issue that may arise among or between barbers, either acting as groups or as individual barbers; provided, however, that nothing contained in this act shall be construed to affect the status, force or operation of any regulations of the state board of health, or of any local health ordinance, or regulation, or to affect the authority now vested in the department of labor of the state of Oregon. All provisions of this act shall apply to and be binding upon all persons to whom, under any other laws of this state, the board of barber examiners is authorized to issue licenses or certificates of registration, including barbers, barber apprentices and hair cutters in beauty shops as defined in such laws.

"Section 10. That the board may decline to grant a barber's or hair cutter's license, or other license, or may suspend or revoke such license if already granted, upon due notice and opportunity of hearing to the applicant, or licensee, when satisfied that any such person has violated any of the provisions of this act. * * *"

The first act in this state that sought to vest the State Board of Barber Examiners with power to adopt a scale of minimum prices for barber services was adopted by the legislative assembly in 1943: ch 330, Oregon Laws 1943. The 1943 act came before this court for consideration on an appeal in a declaratory judgment proceeding, wherein the trial court had decreed the law to be constitutional. This court reversed the decree, holding the act to be an unconstitutional delegation of legislative authority. *La Forge v. Ellis,* 175 Or 545, 154 P2d 844. It was the evident purpose of the legislature in adopting the act of 1945 to meet the objections sustained against the prior law. In passing, it should be noted that the plaintiff in the former appeal is the same person as the defendant in the instant case.

In *La Forge v. Ellis,* supra, the same attack was made upon the 1943 act as is now being made by defendant respecting the present law. However, this court did not pass upon the objection that the law violated the provisions of the Fourteenth Amendment to the federal constitution, confining its consideration to the claim that the act was invalid as an attempt unlawfully to delegate legislative authority. Yet, Mr. Justice Lusk, in writing the opinion of the court, recognized the importance of the contention respecting the Fourteenth Amendment, for at page 547 he said:

"By invoking the Fourteenth Amendment the plaintiff has raised the important question whether a law requiring barbers to charge minimum prices for their services is an arbitrary interference with the right of the individual to pursue a lawful calling, or is sustainable as an exercise of the state's police power on behalf of the public health and welfare."

Upon this appeal, however, we are of the opinion that the question is squarely presented whether the legislation in question violates the provisions of the Fourteenth Amendment, and, therefore, we shall direct our attention to that phase of the problem.

Obviously, the adoption of this law can be justified only upon the theory that it is in the interests of the public order, health, safety, and welfare; that it is a reasonable and proper exercise of the inherent police power residing in the state.

■ ■ We are not concerned with the policy of the law, its wisdom, or expediency, but only with the power of the legislature to enact it. The presumption is that it did have such power, and the court will not hold otherwise, unless it clearly appears that constitutional provisions have been violated.

The police power is very broad and far-reaching, and it is difficult, if not impossible, definitely to fix its bounds. It is better to decide as each case arises whether the police power extends thereto, as the power is coextensive with the necessities of the case and the safeguards of the public interest. In *Union Fishermen's Co. v. Shoemaker*, 98 Or 659, 673, 193 P 476, 194 P 854, this court said:

"When the state through its legislature enacted the statute now in controversy, it did so upon the assumption that the enactment was an exercise of the police power. Because of the wide range over which this power may be exercised, it is difficult, if not impossible, to mark out in advance the exact limits of its reach; and therefore it cannot be accurately defined although it may be understandingly described. A concise statement, which emphasizes the thought that the field within which the police power may be exerted is very broad, is found in State v. Redmon, 134 Wis. 89, 105 (114

N. W. 137, 126 Am. St. Rep. 1003, 15 Ann. Cas. 408, 14 L. R. A. (N.S.) 229), where it is said:

" 'It is the power to make all laws which in contemplation of the Constitution promote the public welfare.'

"The police power embraces the whole sum of inherent sovereign power which the state possesses, and, within constitutional limitations, may exercise for the promotion of *the order, safety, health, morals, and general welfare of society* \* \* \*."

Also see *Camas Stage Co., Inc. v. Kozer,* 104 Or 600, 612, 209 P 95; 16 CJS, Constitutional Law, 539, § 175.

In 16 CJS, Constitutional Law, 543, § 175b, it is stated:

"The police power extends to the enactment of all laws which, in contemplation of the constitution, are *reasonably necessary to promote the welfare of the public, as distinguished from the interest of a particular class* \* \* \*." (Italics ours.)

■ However, it is a well-established rule that when courts are called upon to apply the judicial test of reasonableness to an act adopted by the legislature, they will accord to the lawmaking body a large discretion in determining not only what the interests of the public require, but also what measures are necessary for the protection of such interests. As was said in *Union Fishermen's Co. v. Shoemaker,* supra, at page 675:

"The legislature, it is true, is not the final judge of the limitations of the police power, and, since the legislative action must be reasonably necessary for the public benefit, the validity of all police regulations depends upon whether they can ultimately pass the judicial test of reasonableness; and yet, it is also true that it is the legislative function primarily to determine the necessity or expediency of measures adopted."

■ In applying the test of reasonableness to a statute adopted by the legislature, the courts give due consideration to a declaration therein that the act is in the interests of the public health, safety, and general welfare. This declaration by the legislature is entitled to great weight, but it is not conclusive.

■ In all cases it is the duty of the courts to enforce the state's police regulations enacted by the legislature in good faith and with reasonable and appropriate regard for the protection which the state owes to the life, health, and property of its citizens. Yet, it is not only within the power, but it also is the duty, of the courts, when called upon, to decide what constitutes a proper exercise of the police power, whether legislation purporting to be enacted in the exercise of the police power is really such, and whether regulations prescribed by the legislature are reasonable, or are otherwise unconstitutional.

■ In the instant case, defendant challenges the validity of the act in question on the ground that it deprives him of a property right without due process of law, in violation of the Fourteenth Amendment. In considering this matter, we must keep in mind that the most important purpose of the written constitution is the protection of the individual right, rather than the collective social right. It is only when the interests and welfare of the public in general are clearly threatened by the unrestricted exercise of the individual right, that the individual right must give way to reasonable limitation and regulation for the public good. The courts must ever be watchful to protect the personal rights guaranteed by state and federal constitutions, and to prevent encroachments thereon by legislative fiat, unless actually essential to the protection of the public welfare.

The Fourteenth Amendment in part provides:

"* * * nor shall any state deprive any person of life, liberty, or property, without due process of law * * *."

■ The right to pursue a lawful calling is protected against adverse state legislation by this constitutional provision. In 16 CJS, Constitutional Law, 625, § 212, the rule is stated:

"The pursuit of any legitimate trade, occupation or business is recognized under our form of government. Such right is a natural, essential, and inalienable right, and is protected alike by the federal and by the various state constitutions, and * * * is included in the constitutional guaranties of due process of law."

Though one has the inalienable right to carry on his business free from all unlawful interference, nevertheless, such right is subject to reasonable regulation in the public interests. Qualification tests for individuals proposing to enter into the practice of certain trades and professions are instances of reasonable regulations adopted for the public good. So also are sanitary regulations applying to certain trades and businesses; the barber trade, for example: title 49, OCLA, *Patton v. Bellingham,* 179 Wash 566, 38 P2d 364, 98 ALR 1076, and note, 1088.

In *Ex parte Northrup,* 41 Or 489, 492, 69 P 445, a case involving a Sunday closing law applying to barbers, the late Mr. Justice WOLVERTON said:

"* * * Every individual, under the constitution, is entitled as of right to the greatest degree of freedom in action compatible with a just preservation of equal rights and privileges to every other citizen and the promotion of the public welfare. This is civil liberty. The fundamental principle upon which it is based is equality under the law, and it signifies not only freedom of the citizen

from servitude and restraint, but accords to every one the right to be left free in the use of his powers and faculties, and to adopt and pursue such vocations and employment as his untrammeled will may suggest, *subject only to such restraint as is necessary to secure the general welfare.* The right of property, in its broad sense, is not only the right of possession and enjoyment, but also the right to secure it through any lawful industry, pursuit, or calling adopted in the exercise of one's liberty, which, it is said, 'is the foundation of all wealth' * * *.'' (Italics ours.)

The sole question for determination here is whether an act fixing the minimum prices to be charged for personal services performed in the barber trade is in truth an act adopted to protect the public order, health, safety, and welfare. Does it bear some reasonable and substantial relation to the object sought to be accomplished, or is it an unreasonable and arbitrary interference with the right to contract, and, in particular, with the right of one to conduct a lawful business, trade, or calling without unnecessary and improper restrictions?

■ Obviously, the right to labor and the right to enjoy the rewards thereof may not be unreasonably interfered with by legislation. A state may not, under the guise of protecting the public, arbitrarily interfere with private businesses or lawful occupations, and any regulation must be reasonable in its nature, directed to the prevention of the evils, and adapted to the accomplishment of the avowed purposes.

In 16 CJS, Constitutional Law, 562, § 195, it is stated:

''* * * *The limit of a state's exercise of the police power is reached when the regulation transcends public necessity.* * * *

''In order that a statute may be sustained as an

exercise of the police power, the courts must be able to see that the enactment has for its object the prevention of some offense or manifest evil or the preservation of the public health, safety, morals, or general welfare, *that there is some clear, real and substantial connection between the assumed purpose of the enactment and the actual provisions thereof,* and that the latter do in some plain, appreciable, and appropriate manner tend toward the accomplishment of the object for which the power is exercised. \* \* \* *The legislature may not exercise the police power for private purposes, nor for the exclusive benefit of particular individuals or classes. A statutory provision which is not a legitimate police regulation cannot be made such by being placed in the same act with a police regulation,* nor by being enacted under a title that declares a purpose which would be a proper object for the exercise of that power.'' (Italics ours.)

In *Patton v. Bellingham,* supra, the Supreme Court of Washington had before it for consideration a municipal ordinance providing for the inspection of barber shops, and also making it unlawful for such shops to open earlier than 8 a.m., or to close later than 6 p.m. on week days other than Saturday or later than 7 p.m. on Saturdays or days preceding holidays. The court held the inspection provisions of the ordinance to be a valid exercise of the city's police power, but decided that the opening and closing requirements were unreasonable and invalid. At page 573 the court said:

"While the interest of the public may be likened unto an irresistible force which compels where it requires, it nevertheless must, under constitutional provisions, both Federal and state, respect the rights of the individual. While the latter may not occupy the fixity of an immovable object, they nevertheless have the protection and sanction of the fundamental law of the land, and they recede before no less a force than that of *public necessity.*
\* \* \*

"The occupation of barbering is a lawful business, and, so far from being an obnoxious one, it is now considered well-nigh indispensable. It may be conceded, as we have already conceded, that its relation to the public is such as to render it amenable to proper regulation, to the end that the public may be protected against the spread of communicable diseases and unsanitary practices. * * * But, in our opinion, the avowed object of the ordinance [Re opening and closing hours] bears no real or substantial relation to the reasonable protection of the public. It belongs, rather, in the category of unreasonable restrictions upon the right of a citizen to engage in a useful and lawful calling and to acquire and possess property and to so use it as will not interfere with the rights of others. *The ordinance seeks not merely to regulate a business, but to dictate its operation.*" (Italics ours.)

In by-gone days when government was deemed to be a responsibility of the people, rather than the people being a responsibility of government, as is unfortunately too much the case today, all legislation of the character now under consideration was deemed an unreasonable interference with the right of the individual to contract and to own and enjoy private property. Laws attempting to fix minimum wages or prices were uniformly held invalid as being in violation of the due process clause of the Fourteenth Amendment. However, in recent years conditions have changed; and as those changes, chiefly economic, have been developing, the law itself has not remained static, but has arisen to meet the new problems of the day, and, in most respects, justly so. As is so well stated in the case of *In re Kazas*, 22 Cal App2d 161, 166, 70 P2d 962:

"* * * There was a time when legislation to promote the public welfare was not included within any conception of the police powers if promotion

of the general welfare as then understood did not concern itself with the promotion of the public health, safety or morals. The interpretation of the law has progressed with the advancement of society. The course of this evolution is aptly described in People v. Nebbia, 262 N. Y. 259 (186 N. E. 694), as follows:

" 'Doubtless the statute before us would be condemned by an earlier generation as a temerarious interference with the rights of property and contract * * *; with the natural law of supply and demand. But we must not fail to consider that the police power is the least limitable of the powers of government and that it extends to all the great public needs; that constitutional law is a progressive science; that statutes aiming to establish a standard of social justice, to conform the law to the accepted standards of the community, to stimulate the production of a vital food product by fixing living standards of prices for the producer, are to be interpreted with that degree of liberality which is essential to the attainment of the end in view.' "

This progress of constitutional law to meet changing conditions is well illustrated by the decisions in two cases coming before the United States Supreme Court. In *Adkins v. Children's Hospital*, 261 US 525, 43 S Ct 394, 67 L ed 785, 24 ALR 1238, decided in 1923, there was involved an act of congress fixing minimum wages for women and children in the district of Columbia. The court held the law unconstitutional as being an unreasonable restriction upon the liberty of women to contract. Prior thereto, the Supreme Court had upheld the validity of an Oregon statute which prohibited the employment of women in certain industries more than ten hours during any one day. *Muller v. Oregon*, 208 US 412, 52 L ed 551, 28 S Ct 324, 13 Ann

Cas 957. The court in the Adkins case pointed out the distinctions to be drawn between the two situations.

In *West Coast Hotel Co. v. Parrish*, 300 US 379, 57 S Ct 578, 81 L ed 703, 108 ALR 1330, decided in 1937, the Supreme Court of the United States had before it for consideration a statute of the state of Washington providing for the establishment of minimum wages for women. The court overruled the Adkins case and upheld the Washington statute. It is interesting to note that both decisions were by a divided court, the latter being a five-to-four decision. In the West Coast Hotel Co. case the court emphasized the special interest the state has in the protection of women. In speaking of the decision in the Muller case, supra, at page 394, the court said:

"We emphasized the consideration that 'woman's physical structure and the performance of maternal functions place her at a disadvantage in the struggle for subsistence' and that her physical well being 'becomes an object of public interest and care in order to preserve the strength and vigor of the race'."

See also *U. S. v. Darby*, 312 US 100, 85 L ed 609, 61 S Ct 451, 132 ALR 1430, wherein the Fair Labor Standards Act was held constitutional.

The decision most relied upon in support of legislation such as that now before this court; i.e., legislation authorizing the fixing of minimum prices, is *Nebbia v. New York*, 291 US 502, 54 S Ct 505, 78 L ed 940, 89 ALR 1469, decided in 1934. In that case the Supreme Court of the United States considered a statute of New York establishing a milk control board with power to fix the minimum and maximum retail prices of milk. The court upheld the validity of the act. In its dis-

cussion the Supreme Court of the United States, at page 523, stated the general rule as follows:

"Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest."

The grounds for the decision in the Nebbia case are well summarized in *Highland Farms Dairy v. Agnew*, 16 F Supp 575, 580, as follows:

"* * * An act of the state Legislature was upheld which established a milk control board with power, among other things, to fix the retail prices to be charged for milk for consumption off the premises where sold. The court held that the rights of property and of contract are not absolute, and that the Fifth Amendment, in the field of federal activity, and the Fourteenth as respects state action, do not prohibit governmental regulation of private business for the public welfare, but require only that the laws shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object to be attained; that the private character of a business does not exempt it from price regulation in the common interest, and that the New York Legislature, having found that the low price of milk in the state had led to a demoralization of the market and affected the health and prosperity of the people, the Legislature acted within the scope of its power in prescribing the regulation described."

However, the court, in the Nebbia case, made it very plain that the rule established as respects the

milk industry did not necessarily apply to all businesses, trades, and occupations, and indicated quite clearly that each case is dependent upon its own circumstances. At page 536 the court said:

"It is clear that there is no closed class or category of businesses affected with a public interest, and the function of courts in the application of the Fifth and Fourteenth Amendments *is to determine in each case whether circumstances vindicate the challenged regulation* as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory." (Italics ours.)

In 1933 the legislature of this state adopted a milk control act similar to the New York law. Ch 72, Oregon Laws 1933, 2d special session. This act, as amended in 1935 (ch 67 and ch 69, Oregon Laws 1935, special session) came before this court for consideration. *Savage v. Martin,* 161 Or 660, 91 P2d 273. In that case Mr. Justice LUSK, in writing the opinion of the court, very thoroughly and capably discussed the constitutional questions involved. We upheld the validity of the act. As justification for the legislation, the court pointed out the very vital part which milk plays in the everyday lives and health of the people. At page 679, Mr. Justice LUSK said:

"The purpose of the provisions of § 13 of the act is to keep the production of surplus milk within reasonable bounds, and thereby to promote and stabilize the industry through the payment of a uniform price to producers. *Laws prescribing minimum prices for milk are justified* by the courts *on the ground,* among others, *that the industry is not only a basic one, which nearly concerns the economic welfare and the health of the people,* but also a unique one. *The public need is for a constant supply of pure, wholesome milk.* In certain markets the demand fluctuates as does the supply.

Milk is a highly perishable product which cannot be stored, but must be sold as fluid milk within a few hours after it is produced; otherwise, it is disposed of in factory channels at lower prices.'' (Italics ours.)

At page 676 it is further stated:

"Whether it be the milk industry, or any other business or calling, the power of regulation may only be put forth to correct some evil, or abuse found by the legislature to exist. The evils which the Oregon Milk Control law are intended to correct are chiefly economic ones, and substantially those which in New York and other states the legislatures deemed adequate basis for the enactment of similar legislation. They are recited in the preamble to the act, and may be summarized as the demoralization of *a paramount industry resulting from the economic emergency and unfair, unjust and destructive economic trade practices which impair the industry in the state and the constant supply of pure, wholesome milk to its inhabitants, and constitute a menace to the health and welfare of the inhabitants of the state.''* (Italics ours.)

It is a matter of common knowledge that most of these price-fixing laws were adopted in the midst of a severe economic depression. They formed a part of much groping about to find a solution to the very serious economic problems confronted in every walk of life. Where the business affected by such laws was found to be one intimately associated with the public health and welfare, such as the milk industry, the statutes were upheld as a reasonable exercise of the police power. However, with an end to the depression, the justification for many of these laws ceased to exist. What was deemed a reasonable exercise of the police power yesterday might not be so considered today.

The control of wages and prices, as a national problem, continues to agitate the nation. This control is demanded as one of the answers to the problem of inflation. On the other hand, such control is resisted as an unreasonable interference with the constitutional right of contract and of property. As a war emergency power, there may be justification for its existence, as there is for innumerable other powers necessary in war, but most obnoxious in times of peace.

Under our constitutional theory of government, emergencies never create power; they only justify the exercise of a power always held, but which may have lain dormant. The basic principles of our constitution are the true principles in the science of government. They never change. Changed conditions may and do warrant their broader application, but no conditions could ever justify their subversion or abandonment.

In the instant case we are not concerned with legislation having a well-recognized and direct bearing upon the health, happiness, and well-being of the public as a whole. We are concerned with a price fixing statute of primary interest to the barber trade itself. It is a statute that seeks to accomplish by legislative fiat what apparently the barbers are unable to do by agreement among themselves. Sanitary regulations are necessary and proper, as applied to the barbering business, in the interests of the public health and welfare, but it is clear that the prices barbers charge for their personal services have no direct or indirect bearing upon the welfare of the people as a whole. Legislative declaration cannot make that true which is untrue.

If the legislature, in the exercise of the police power, may fix minimum prices to be charged by barbers, it

may, by the same token, fix maximum prices. Fixed maximum prices might in truth benefit the public, but at the expense of the barber. It is manifest that the barber would not want that type of legislation. Yet it is clear that what today is considered by a particular trade as a shield may tomorrow become a sword in the hands of the public. Moreover, if the legislature has the constitutional power to fix prices for barbers, it also has the power to fix prices for personal services rendered in other trades, occupations, and professions. Every trade, occupation, and profession caters to and serves the public, and ordinarily the public has no more interest in the economic welfare of any one over the other. There is nothing peculiar about the barber business, as distinguished from many other businesses and professions involving the rendition of personal services. Both the medical and dental professions, for example, render personal services to the public, services which have a direct bearing upon the public health. Are the prices charged for such services subject to legislative dictation? We think not. To some extent, the same situation applies to the legal profession.

In the legal profession a schedule of minimum fees has been adopted by the Oregon State Bar, but that is the result of voluntary action on the part of the members of the Bar, not by reason of legislative act.

In the present day it is clear that barbers, like all other men and women engaged in trades and occupations, need an assured income to meet the high cost of living, and that minimum prices for services performed may be proper. But this is a matter exclusively for agreement among themselves. It does not come within the field of justifiable legislative action. The law by which the barbers must regulate their prices is

not one enacted by the legislature, but is the economic law of supply and demand.

10. The general rule as applied to legislation fixing minimum prices for the rendition of personal services is well stated in the note in 111 ALR, at page 354:

"It may be stated generally that where a trade or business in connection with which services are to be performed is not a business affected with a public interest or devoted to a public purpose, statutes fixing or regulating prices for personal services are held unconstitutional as an abridgment of the privileges and immunities, due process, equal protection, and freedom of contract provisions."

A number of the states have adopted statutes similar to the Oregon statute respecting the fixing of minimum prices to be charged by barbers. We have examined the statutes of Arizona, California, Colorado, Florida, Kansas, Louisiana, Montana, Minnesota, New Mexico, North Dakota, South Dakota, and Oklahoma. In most of the statutes of the several states mentioned, we find much the same phraseology as is used in the act now before this court.

We recognize the fact that, in some states, statutes of this character have been held constitutional; while in others they have been rejected as being invalid. We are of the unanimous opinion that those decisions holding the act to be unconstitutional are based upon much sounder reasoning, and that the courts have shown more solicitude for the constitutional rights of the individual, than do those taking the opposite view.

Perhaps the best discussion of the subject is to be found in *In re Kazas,* supra. In that California decision the court held an act providing for price fixing for barbers unconstitutional and void. Also see *State*

*Board of Dry Cleaners v. Thrift-D-Lux Cleaners, Inc.,
et al.,* (Cal 1951) 234 P2d 220.

In *Mobile v. Rouse,* 233 Ala 622, 173 So 266, 111
ALR 349, a similar law was held to be unconstitutional.

At page 623, the court said:

"It is the consensus of judicial opinion, state
and federal, that the right of an individual engaged
in an inherently lawful occupation to fix the price
for which he will render personal service is a part
of the liberty reserved to him against governmental
encroachment, protected by the Constitutions, both
State and Federal. [Citing cases]"

At page 625 the court further stated:

"Personal services can not become affected
'with public interest' unless the service rendered
is official in character, or is rendered in connection
with a business 'affected with public interest' or
'devoted to a public purpose'."

In *Noble v. Davis,* 204 Ark 156, 161 SW2d 189, the
court also held as invalid an act fixing minimum prices
for services performed by barbers. In the Arkansas
act, as in § 1 of the Oregon law, there is stated the
purpose thereof. Respecting that statement, the
Arkansas court, at page 159, said:

"That portion of Section 1 of said Act 432, above
quoted, where the legislature declared that the pur-
pose of the Act is the protection of the public health,
safety, etc., is the declaration of a non-existent fact.
The fact that the legislature so declared the pur-
pose of the Act does not make it so, if in fact, the
declared purpose has no substantial connection with
the real purpose of the Act. The real and only
purposes of the Act were to confer power on appel-
lants to establish (1) minimum price schedules for
barbers; (2) minimum commissions to be paid to
barbers for their services; and (3) opening and
closing hours for barber shops. Now just what

connection these three purposes have with the 'protection of the public safety, health, welfare and general prosperity,' or with either of them, is difficult to perceive. How can the price a barber charges for a haircut or shave, or the commission the owner pays the barbers, or the hour the shop opens or closes affect the public safety, health, welfare or prosperity?''

To the same effect, see *State Board of Barber Examiners v. Cloud,* 220 Ind 552, 44 NE2d 972; *Duncan v. City of Des Moines,* 222 Iowa 218, 268 NW 547; *State v. Greeson et al.,* 174 Tenn 178, 124 SW2d 253.

In *State Board of Barber Examiners v. Cloud,* supra, the Indiana court fully discussed the question now before this court. As a part of the discussion, at page 568, it said:'

'' \* \* \* The smallness of the group [barbers] does not militate against such remedial measures as are necessary to protect the general public against danger coming from the group. But on the other hand we think the police power ought not be used for the financial benefit of a relatively small group in the guise of legislation for the public welfare. Particularly is this true when the great majority of the people including the dissenting barbers will not be benefited but perhaps be hurt by the price legislation. The possibility of a general economic benefit because of financial benefit to barbers as a class is too remote to be considered as being in the public welfare. Using the formula stated by Mr. Justice Holmes, the 'public good' is not conserved and the reason for regulation is not 'adequate'. Using the older phrase, the barber business is not so 'affected with a public interest' as to justify the measures provided in this Act.''

As above stated, there are decisions in which Acts similar to that now before this court were held con-

stitutional. *McRae v. Robbins,* 151 Fla 109, 9 So2d 284; *Board of Barber Examiners of Louisiana v. Parker,* 190 La 214, 182 So 485; *State v. McMasters,* 204 Minn 438, 283 NW 767; *Herrin et al. v. Arnold,* 183 Okla 392, 82 P2d 977, 119 ALR 1471; *Arnold v. Board of Barber Examiners et al.,* 45 N Mex 57, 109 P2d 779.

However, we are of the opinion that preservation of the individual's constitutional right of contract and of property without unnecessary and unreasonable interference is of utmost importance to the public welfare in general. The act under consideration in this case unreasonably and unnecessarily interferes with and restricts defendant's constitutional right to carry on his business and to render his services at prices suitable to himself, and is, therefore, unconstitutional and void. The able trial judge correctly sustained the demurrer to the complaint.

Decree affirmed.