Argued February 23, affirmed April 18, 1956

# GENERAL ELECTRIC COMPANY *v.* WAHLE

296 P. 2d 635

*Clarence J. Young* argued the cause for appellant. On the briefs were Koerner, Young, McColloch & Dezendorf and John P. Bledsoe, Portland.

*Eric R. Haessler* argued the cause for respondent. On the brief were Keane and Haessler, Portland.

TOOZE, J.

This is a suit for an injunction and for damages, brought by General Electric Company, a corporation, as plaintiff, against Rolla H. Wahle, dba R. H. Wahle

Co., as defendant. Defendant's general demurrer to plaintiff's amended complaint was sustained. Plaintiff refused to plead further, and a decree was entered dismissing the suit. Plaintiff appeals.

Plaintiff is a New York corporation authorized to transact business in Oregon. It is engaged in the manufacture and sale of electric appliances, clocks, automatic blankets, fans, vacuum cleaners, heating pads, and other electrically operated devices. All said products bear plaintiff's trademark "General (GE) Electric," and are sold in this state in free and open competition with appliances of the same general class produced by others. Plaintiff carries on a nation-wide program of advertising respecting its trademarked products through the medium of newspapers, dealer and distributor cooperative advertising, magazines of national circulation, radio and television, and has established a valuable reputation and good will for the said appliances and for the trademark under which they are produced and sold.

Defendant, as alleged in plaintiff's complaint and as admitted by the demurrer, is engaged in the sale at retail of electrical appliances at 131 N.W. Fourth avenue in the city of Portland, Multnomah county, Oregon.

Acting pursuant to the Fair Trade Act of this state (ORS 646.310 to 646.370), plaintiff has entered into agreements with more than 200 retail dealers in the state of Oregon, all in the same form, under which plaintiff stipulated the minimum retail resale prices at which said products should be sold. *The defendant was not a party to any of such contracts,* but he had express notice of their existence and of the minimum prices thereby established.

On or about November 25, 1953, and thereafter, the

defendant, with knowledge of said contracts and the minimum prices thereby fixed, willfully advertised, offered for sale and sold at retail, one or more of said appliances manufactured and sold by plaintiff and bearing its trademark at prices which were lower than those stipulated by plaintiff in said agreements. The sales made by defendant were in the ordinary course of business as a retailer and did not come within any of the exceptions provided for in the Fair Trade Act.

All the facts heretofore stated are to be found alleged in plaintiff's complaint, and for the purposes of the general demurrer are admitted to be true. In support of his demurrer, defendant contended:

1. That the written contract entered into between plaintiff and some retailers was not the type of contract contemplated by the Fair Trade Act, lacked consideration, and was unenforceable;

2. That the Fair Trade Act constituted an unconstitutional delegation of legislative power to a private person to fix prices in violation of the provisions of the Oregon Constitution; and

3. That the operation of the Fair Trade Act as to nonsigners of a contract to fix minimum prices for retailers amounts to a denial of due process under the state constitution.

The trial judge (the distinguished, capable, and much-beloved Lowell Mundorff, since deceased), in a memorandum opinion, when denying plaintiff's motion for a preliminary injunction upon the ground that the Fair Trade Act was unconstitutional as it applied to nonsigners, erroneously held that the contract involved here was not a contract coming within the terms of the Act and was "nudum pactum and invalid and unenforceable for want of consideration." The constitutionality of the Fair Trade Act as it applies to nonsigners of the so-called Fair Trade agreements is

squarely presented in this litigation, and we will consider the matter from that standpoint.

■ By virtue of the provisions of the Miller-Tydings Act (50 Stat 693, 15 USCA § 1), and the later McGuire Act (66 Stat 632, 15 USCA § 45), no question can be raised as to the constitutionality of Oregon's Fair Trade Act as it applies to the actual parties to a contract entered into pursuant to its terms.

Oregon's Fair Trade Act is in language substantially the same as that appearing in the Fair Trade Acts of some 44 other states of the Union. Our statute uses the phrase "*free* and open competition," whereas, some other state statutes read "*fair* and open competition," but insofar as our decision in this case is concerned we deem that difference wholly immaterial.

The provisions of the Oregon Fair Trade Act material to our discussion are the following:

"A contract relating to the sale or resale of a commodity which bears, or the label or container of which bears or the vending equipment through which the commodity is sold bears, the trade-mark, brand or name of the producer or distributor of the commodity and which commodity is in free and open competition with commodities of the same general class produced or distributed by others is not in violation of any law of Oregon by reason of any of the following provisions which may be contained in the contract:

"(1) That the buyer will not resell the commodity at less than the minimum price stipulated by the seller.

"(2) That the buyer will require of any dealer to whom he may resell the commodity an agreement that he will not, in turn, resell at less than the minimum price stipulated by the seller.

"(3) That the seller will not sell the commodity:

"(a) To any wholesaler, unless the wholesaler will agree not to resell the commodity to any retailer

unless the retailer will in turn agree not to resell the commodity except to consumers for use and at not less than the stipulated minimum price, and unless the wholesaler will likewise agree not to resell the commodity to any other wholesaler unless the other wholesaler will make the same agreement with any wholesaler or retailer to whom he may resell; or

"(b) To any retailer, unless the retailer will agree not to resell the commodity except to consumers for use and at not less than the stipulated minimum price." ORS 646.340

"Wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of ORS 646.330 to 646.360, *whether the person so advertising, offering for sale or selling is or is not a party to the contract, is unfair competition and is actionable at the suit of any person damaged thereby.*" (Italics ours.) ORS 646.370

Article I, § 21, Oregon Constitution, provides in part:

"No ex post facto law, or law impairing the obligations of contracts, shall ever be passed, *nor shall any law be passed, the taking effect of which shall be made to depend upon any authority,* except as provided in this constitution; * * *." (Italics ours.)

Article I, § 20, Oregon Constitution, provides:

"No law shall be passed granting to any citizen or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens."

At the outset we take note of the following contention made by plaintiff on this appeal. It states in its brief:

"The Supreme Court of this state has twice held that the Fair Trade Act of Oregon is constitutional; such holdings are binding upon the trial court."

The first case cited by plaintiff in support of the foregoing proposition is: *The Borden Co. v. Schreder,* 182 Or 34, 37, 185 P2d 581. That case was decided in 1947.

In that case we said:

"In the Circuit Court defendant challenged the constitutionality of the Fair Trade Act on various grounds, *but on appeal has abandoned such contentions.* Ever since the decision of the Supreme Court of the United States in Old Dearborn Distributing Co. v. Seagram-Distillers Corp., decided in 1936, 299 U.S. 183, 81 L. ed. 109, 57 Sup. Ct. 139, 106 A.L.R. 1476, sustaining the constitutionality of the Fair Trade Act of Illinois, the validity of such legislation has not been considered an open question." (Italic ours.)

■ From the foregoing statement, upon which plaintiff relies, it is manifest that the constitutionality of the Fair Trade Act was not before this court for decision in the Schreder case. The statement that since the decision in the Old Dearborn case, "the validity of such legislation has not been considered an open question," could hardly be deemed a holding that the Fair Trade Act met the demands of the Oregon Constitution as respects nonsigners to Fair Trade contracts. The Old Dearborn decision dealt with constitutional questions arising under the federal constitution. Only the courts of this state have the jurisdiction or power to interpret and apply the provisions of the Oregon Constitution as to state statutes.

■ It is elementary that the decisions of the Supreme Court of the United States interpreting and applying the provisions of the federal constitution are, until overruled by that court, final and binding upon all courts, state and federal. Constitutional questions so determined cease to be open questions, particularly in-

sofar as state and lower federal courts are concerned. That is all we said in the Schreder case. Even to say that was unnecessary to our decision. It is manifest from what is first quoted above that the statement respecting the constitutionality of the Act was pure dictum.

The second case cited by plaintiff in support of its claim is *Federal Cartridge Corp. v. Helstrom,* 202 Or 557, 276 P2d 720, decided in 1954. In that case Federal Cartridge Corp. was attempting to enforce the provisions of Oregon's Fair Trade Act against the defendant Helstrom as to merchandise purchased by defendant when no valid Fair Trade Act was in effect in this state. An examination of the opinion in that case will disclose that we expressly refused to pass upon the constitutionally of the Fair Trade Act. We based our decision denying relief to Federal Cartridge Corp. upon other grounds. Unfortunately, in the opinion in that case we did, without further explanation, make the statement that, based upon the decision of the United States Supreme Court in the Old Dearborn case, we had, in the *Borden Co. v. Schreder* case, supra, "held the Fair Trade Law of this state to be constitutional." Unexplained, we confess that that statement might be somewhat misleading and misunderstood. By it we had no intention of holding the Act constitutional as applied to nonsigners, nor to in any way enlarge upon the holding in the Schreder case. What was said by way of dictum in the Schreder case was based upon the Old Dearborn decision and as of the time the Schreder decision was handed down was correct as to the federal questions involved. In the Federal Cartridge Corp. case we had no intention of saying more. Even as to the federal questions involved, what we said in the Schreder case must be viewed from the stand-

point of the situation existing at the time the decision was rendered, and not in the light of the later decision of the Supreme Court of the United States in *Schwegmann Bros. v. Calvert Corp.*, 341 US 384, 95 L ed 1035, 71 S Ct 745, 19 ALR2d 1119.

In our discussion of the issues in the Federal Cartridge Corp. case we referred to the Old Dearborn case for the purpose of showing that even under its holding, trademarked articles acquired when no valid Fair Trade Act was in force could not be affected by the provisions of the Act when later it did become effective. We used the Old Dearborn case decision in this connection simply because most state courts upholding the constitutionality of their Fair Trade Acts have based their conclusions on that decision. Without that decision to rely upon, the courts would no doubt have been compelled to declare the Acts unconstitutional (*Dr. Miles Medical Co. v. Parks & Sons Co.*, 220 US 373, 55 L ed 502, 31 S Ct 376); that is, in violation of the federal constitution. In the Federal Cartridge Corp. case we also assumed the constitutionality of the Fair Trade Act for the purposes of the decision, but by so doing we did not thereby place our stamp of approval upon its constitutionality.

In 1951 the validity of Oregon's Fair Trade Law, as applied to nonsigners, came directly before this court for decision. In *Lambert Pharmacal Co. v. Roberts Bros.*, 192 Or 23, 233 P2d 258, we held, on authority of the *Schwegmann Bros. v. Calvert Corp.* case, supra, that plaintiff's resale price maintenance activities were illegal per se, as being in violation of the provisions of the Sherman Antitrust Act. As applied to nonsigners, the Act was held to be invalid and void. Referring to the decision in *Schwegmann Bros. v. Calvert*

*Corp.*, Mr. Justice LUSK, in speaking for this court said:

"On May 21, 1951, * * * the Supreme Court of the United States * * * held * * * that the Miller-Tydings Amendment only removed the taint of illegality from *contracts* or *agreements* prescribing minimum resale prices, not from efforts to force nonsigners to observe such prices; * * *."

That is the only decision by this court in which the constitutionality of the Fair Trade Act as applied to nonsigners was squarely presented and decided. However, subsequently Congress enacted the McGuire Act, supra. The expressed purpose of the McGuire Act was to overcome the objections to the Fair Trade laws as they applied to nonsigners and as determined in the Schwegmann case. Whether Congress in the Act accomplished its purpose is open to serious question, if what was said in the Schwegmann case is to be accepted at face value. Mr. Justice Douglas, in speaking for the court, compared the Louisiana Fair Trade Act provisions with those of the Miller-Tydings Act, saying in part:

"* * * We start then with a federal act which does not * * * turn over to the states the handling of the whole problem of resale price maintenance on this type of commodity. What is granted is a limited immunity—a limitation that is further emphasized by the inclusion in the state law and the exclusion from the federal law of the nonsigner provision. The omission of the nonsigner provision from the federal law is fatal to respondents' position unless we are to perform a distinct legislative function by reading into the Act a provision that was meticulously omitted from it.

"A refusal to read the nonsigner provision into the Miller-Tydings Act makes sense if we are to take the words of the statute in their normal and customary meaning. The Act sanctions only 'con-

tracts or agreements.' If a distributor and one or more retailers agree, combine, or conspire to fix a minimum price, they can do so if state law permits. Their contract, combination, or conspiracy—hitherto illegal—is made lawful. They can fix minimum prices pursuant to their contract or agreement with impunity. *When they seek,* however, *to impose price fixing on persons who have not contracted* or agreed to the scheme, *the situation is vastly different.* That is not price fixing by contract or agreement; *that is price fixing by compulsion.* That is not following the path of consensual agreement; that is resort to coercion.'' (Italics ours.)

Further discussing the Miller-Tydings Amendment, the court said:

''* * * Had Congress desired to eliminate the consensual element from the arrangement and to permit blanketing a state with resale price fixing if only one retailer wanted it, we feel that different measures would have been adopted—either a nonsigner provision would have been included or resale price fixing would have been authorized without more.''

Unquestionably it was to comply with the foregoing suggestion that the McGuire Act was enacted. Subdivision (3) of § 45, Title 15, USCA, as amended by the McGuire Act, provides:

'' (3) Nothing contained in this section or in any of the Antitrust Acts shall render unlawful the exercise or the enforcement of any right or right of action created by any statute * * * now or hereafter in effect in any State * * * which in substance provides that willfully and knowingly advertising, offering for sale, or selling any commodity at less than the price or prices prescribed in such contracts or agreements *whether the person so advertising, offering for sale, or selling is or is not a party to such a contract* or agreement, is unfair

competition and is actionable at the suit of any person damaged thereby.'' (Italics ours.)

Had Congress stopped there, but little question could be raised as to the effect of the Act as an enabling Act; the ban of the Sherman Antitrust Act against non-signer liability as fixed in the state statutes and as discussed in the Schwegmann case would have been removed. However, in subd. (5), it is provided in the McGuire Act:

"(5) Nothing contained in paragraph (2) of this subsection shall make lawful contracts or agreements providing for the establishment or maintenance of minimum or stipulated resale prices on any commodity * * * between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other.''

This same provision was contained in the Miller-Tydings Act. Mr. Justice Douglas, in discussing that provision in the Schwegmann case, said:

"It should be noted in this connection that the Miller-Tydings Act expressly continues the prohibitions of the Sherman Act against 'horizontal' price fixing by those in competition with each other at the same functional level. [That is true of the McGuire Act.] Therefore, when a state compels retailers to follow a parallel price policy [That is what is done by the nonsigner provision.], *it demands private conduct which the Sherman Act forbids.* See Parker v. Brown, 317 US 341, 350, 63 S Ct 307, 313, 87 L ed 315. Elimination of price competition at the retail level may, of course, lawfully result if a distributor successfully negotiates individual 'vertical' agreements with all his retailers. *But when retailers are forced to abandon price competition, they are driven into a compact in violation of the spirit of the proviso which forbids*

*'horizontal' price fixing. A real sanction can be given the prohibitions of the proviso only if the price maintenance power granted a distributor is limited to voluntary engagements.* Otherwise, the exception swallows the proviso and destroys its practical effectiveness." (Italics ours.)

Under the nonsigner provision of our Fair Trade Act all retailers in this state of the same trademarked commodity are compelled to follow a parallel price policy; the Act still "demands private conduct which the Sherman Act forbids," subd. (3) of the McGuire Act notwithstanding. By virtue of the provisions of the statute, "retailers are forced to abandon price competition" and "are driven into a compact in violation of the spirit of the proviso which forbids 'horizontal' price-fixing" (subd. (5) of the McGuire Act, supra). *Schwegmann Bros. v. Calvert Corp.,* supra.

In the Old Dearborn case the Supreme Court based its conclusion that a nonsigner was subject to the price-fixing provisions of the Fair Trade Act upon the theory that such person, by purchasing the trade-marked goods with knowledge of the Fair Trade contract and the statute applicable thereto, impliedly assented to the contract and, by such implied assent, ratified and became a party to and was bound by the contract. At page 193 of 299 US, the court in the Old Dearborn case said:

"Appellants here *acquired the commodity* in question with full knowledge of the then-existing restriction in respect of price which the producer and wholesaler had imposed, and, of course, with presumptive if not actual knowledge of the law which authorized the restriction. *Appellants were not obliged to buy; and their voluntary acquisition of the property with such knowledge carried with it,* * * * *assent to the protective restriction,* with consequent liability under § 2 of the law by

which such acquisition was conditioned.'' (Italics ours.)

Under this theory nonsigners are forced into a compact to fix prices on the retail level—horizontal price-fixing—although expressly prohibited by the Sherman Antitrust Act, together with the Miller-Tydings Amendment and the McGuire Act, from voluntarily entering into any such agreement. This no doubt is what Justice Douglas had in mind when he made the statements hereinabove quoted. The result reached by the operation of the Fair Trade Act is "horizontal price-fixing" by compulsion, but the fact that the compact is reached by coercion in no way changes its essential character.

■ However, we frankly concede that the final interpretation of the McGuire Act as it applies to state Fair Trade Acts is exclusively a matter for determination by the Supreme Court of the United States. It is not for this court to say whether or not the McGuire Act met the objections to nonsigner liability so ably stated in *Schwegmann Bros. v. Calvert Corp.,* supra. Until the Supreme Court decides the matter, it remains an open question, but it is not for us to speculate upon what it may or may not say when it is called upon to decide the issue. We attach no importance to the fact that in one or two cases in which the question might have been decided, the Supreme Court denied certiorari.

Because of the uncertainty engendered by the passage of the McGuire Act after the decision in the Schwegmann case and doubt as to what the Supreme Court of the United States may ultimately decide as to its effect upon Fair Trade Acts, we propose to discuss and decide the issue now before us solely in the light of the provisions of our own state constitution.

The announced purpose of the Fair Trade Act is to protect the trademark and good will attached thereto of manufacturers and producers of trademarked commodities. The Supreme Court of the United States in the Old Dearborn case adopted that theory. It is claimed that resale price maintenance is necessary for the purpose. It is contended that a sale below the price fixed by the manufacturer or producer constitutes an assault upon and is injurious to that good will; the Fair Trade Acts call it unfair competition. That guise has been adopted to hide the true purposes and effects of the law.

■■ This is a suit in equity, and equity always regards the substance rather than the form. In substance, what is the real purpose of the Fair Trade Act? Regardless of how its true nature may be camouflaged by high-sounding terms such as "free and open competition," "unfair competition," "protection of good will," etc., it is a matter of common knowledge that it is a price-fixing statute designed principally to destroy competition at the retail level. Protection of the "good will" of the trademark owner is simply an excuse and not a reason for the law. According to eminent writers in law reviews, pressure for the passage of these Acts came not from manufacturers or other trademark owners but from distributors—first and foremost the retail druggists associations and then other retail and wholesale distributors. 21 Chicago L Rev 175; 46 Ill L Rev 349; 63 Harvard L Rev 546; 61 Yale LJ 381; 49 Yale LJ 607. Binding nonsigners to a contract stipulating prices is the backbone of the Act. Without that the law can accomplish little in the way of resale price maintenance on trademarked articles. As between the parties to a contract—the manufacturer and the retailer, the manufacturer and the wholesaler, the whole-

saler and the retailer—the agreement might fairly be described as one for price maintenance, but as to a nonsigner it is an agreement that fixes the prices at which he may sell; it is statutory price-fixing by compulsion. In the Schwegmann case Mr. Justice Douglas correctly referred to the effects of the statute as applied to nonsigners as *price-fixing,* although in the Old Dearborn case the court had spoken otherwise (299 US 191, 192, 193). Whatever the form of the Fair Trade Act, price-fixing at the retail level is its substance.

■ It is a matter of common knowledge that most of these price-fixing laws were adopted in the midst of a severe economic depression. Where the business affected by such laws was found to be one intimately associated with the public health and welfare, such as the milk industry, the statutes were generally, but not universally, upheld as a reasonable exercise of the police power. *Savage v. Martin,* 161 Or 660, 679, 91 P2d 73. But as we said in *Christian et al. v. La Forge,* 194 Or 450, 471, 242 P2d 797;

"* * * However, with an end to the depression, the justification for many of these laws ceased to exist. What was deemed a reasonable exercise of the police power yesterday might not be so considered today."

The Fair Trade Acts were adopted in an effort to salvage some of the wreckage of the ill-fated N.I.R.A., commonly spoken of as NRA. When the Supreme Court of the United States struck down that attempt by the national government to completely control and dominate business, labor, and industry (*Schecter Poultry Corp. et al. v. United States,* 295 US 495, 79 L ed 1570, 55 S Ct 837, 97 ALR2d 947) distributors who had been organized in Code Authorities under the NRA and had dealt with the problems of loss leaders, price-

cutting, and so-called predatory or cut-throat price competition, turned to the Fair Trade Acts as a partial substitute. 49 Yale LJ 616. Like NRA, the Fair Trade Act is an offspring of a planned economy, spawned in the depression years. The NRA and all its successors constituted assaults upon our competitive system. Under the emergency conditions existing at the time of their enactment, there may have been justification for some of the statutes as being necessary to the protection of the public health and welfare, but that could hardly be true of all of them.

The right to pursue any legitimate trade, occupation or business is a natural, essential, and inalienable right, and is protected by our constitution. Constitution of Oregon, Art I, § 20; 16 CJS 625, Constitutional Law § 212. The right of an owner of property to fix the price at which he will sell it is an inherent attribute of the property itself and is within the protection of the state and federal constitutions. *Ex parte Northrup,* 41 Or 489, 492, 69 P 445; *New State Ice Co. v. Liebmann,* 285 US 262, 76 L ed 747, 52 S Ct 371; *Tyson & Brother v. Banton,* 273 US 418, 429, 71 L ed 718, 47 S Ct 426, 58 ALR 1236. The right to contract is also a property right protected by Art I, § 20, Oregon Constitution. *Crouch v. Central Labor Council,* 134 Or 612, 293 P 729, 83 ALR 193.

Under the Fair Trade Act the minimum price at which defendant, a nonsigner, may sell the trademarked commodity owned by him is fixed, not by any agreement into which he has voluntarily entered, but by legislative fiat. The legislature has delegated to private parties the authority to fix a minimum resale price initially, and to change it at will. When the price is so fixed as between the parties to the contract, then the legislature has said that the nonsigner must not sell

at any price lower than that. As between the parties to the contract, therefore, the price stipulated in the agreement is the fixed price; as to the nonsigner the legislature has declared that price to be the fixed price for the nonsigner. That situation results in a combination of private and legislative price-fixing.

The enactment of the Fair Trade Act can be justified only upon the theory that it constitutes a reasonable and proper exercise of the inherent police power residing in the state. The police power is broad and far-reaching, and it is difficult, if not impossible, definitely to fix its bounds. Yet an exercise of the police power can never be justified unless it is reasonably necessary in the interests of the public order, health, safety, and welfare. The legislature is not the final judge of the limitations of the police power, and, because the legislative action must be reasonably necessary for the public benefit, the validity of all police regulations depends upon whether they can ultimately pass the judicial test of reasonableness. *Union Fishermen's Co. v. Shoemaker,* 98 Or 659, 673, 675, 193 P 476, 194 P 854.

It is a firmly established principle of constitutional law in this state that the legislature is without power to enact a statute fixing minimum prices for the sale of commodities or the performance of personal services unless the business involved in such price regulations is one affected with a public interest or devoted to a public purpose. To be a valid exercise of the police power, the statute and the regulations thereunder must have a well-recognized and direct bearing upon the health, happiness, and well-being of the public as a whole. *Christian et al. v. La Forge,* supra.

Viewed from a realistic standpoint, it is difficult to find any justification for the Fair Trade Act based

upon considerations of the public health, safety, morals, and welfare. We can see no real and substantial connection between the nebulous theory that fixed minimum resale prices are necessary to protect the good will of the trademark owner and the welfare of the public. We agree with what the Supreme Court of Michigan said in *Shakespeare Co. v. Lippman's Tool Shop Sporting G. Co.*, 334 Mich 109, 54 NW2d 268, respecting the good will attached to the trademarked commodity:

"But is plaintiff's good will, trademark or brand name wrongfully appropriated or stolen by defendant by means of its cut-rate retail sales? It may be that they are adversely affected thereby as, indeed, they would by a competitor's placing a better product on the market for less money. Does such adverse effect in and of itself constitute a violation of plaintiff's rights or a wrongful appropriation of its good will? We think not. Trademarks and brand names, together with the good will attendant thereon, are protected in certain respects by act of congress. 15 USCA § 1051, et seq. The function of a trademark is simply to designate the goods as the product of a particular manufacturer or trader and to protect his good will against the sale of another's product as his; to prevent confusion of the public regarding the origin of goods of competing vendors. It was for that purpose that the law created a protective shield around trademarks, brand names and the good will connected therewith. [Citing authorities.] Defendant's cut-rate sales have breached no such trademark rights of plaintiff. Plaintiff's trademark rights do not go as far as urged by it. * * * They do not enable it to sell its cake and have it, too."

The Michigan court held the Fair Trade Act provision respecting sale by nonsigner retailers of articles below the minimum price fixed in the contract between the manufacturer and others to be a deprivation of

property without due process of law as to such non-signer in violation of the Michigan constitution, and also that it constituted legislation beyond the scope of the police power in that it bore no reasonable relation to public morals, health, safety, or the general welfare.

In 49 Yale LJ 607 and in 21 Chicago L Rev 175, are to be found exhaustive and well-written articles concerning the Fair Trade statutes by two eminent scholars, viz., Harry Shulman, Sterling Prof. of Law, Yale Law School, and Carl H. Fulda, Prof. of Law, Rutgers University, respectively. From the facts and statistics given, the accuracy of which seem beyond question, it is plainly apparent that the consumer is not benefited, but on the contrary is harmed by the operation of the Fair Trade Act. The consumer is the public. He is compelled to pay a higher price for a given commodity in order that the retailer may be guaranteed a higher fixed, and often unreasonable, profit. If Professors Shulman and Fulda are correct in their observations, and we have no reason to believe otherwise, it is obvious that the whole scheme of the Fair Trade Acts is one for private, rather than public, gain, a scheme fathered by highly organized groups of distributors and retailers, interested not in the public weal, but only in their own selfish ends. Manifestly, such a scheme bears no relation whatever to the public morals, health, safety, or general welfare.

In *McGraw Electric Co. v. Lewis & Smith Drug Co., Inc.,* 159 Neb 703, 68 NW2d 608, decided in 1955, the Nebraska Supreme Court in a well-reasoned opinion, held the Fair Trade Act of that state, as it applied to nonsigners, unconstitutional and void, as being in violation of the special privilege and immunity and due process clauses of the Nebraska Constitution.

In *Cox v. General Electric Co.,* 211 Ga 286, 85 SE2d

514, 519, the Georgia Supreme Court struck down the Fair Trade Act of that state as it applied to nonsigners, principally upon the ground that the statute violated the due process clause of the Georgia Constitution. The Georgia court said:

"We are also familiar with the modern trend to allow the government to encroach more and more upon the individual liberties and freedoms. So far as we are concerned, we will not strike down the Constitution of our State for this purpose; neither will we follow the crowd. The scheme described in the petition now under consideration permits a manufacturer, under the guise of protecting his property rights in a trade name and trademark, to control the price of his product down through the channels of trade into the hands of the ultimate consumer, and into the hands of persons with whom he has no contractual relation whatever. This statute clearly violates the provisions of the due-process clause of the Constitution of the State of Georgia."

See also *Grayson-Robinson Stores, Inc. v. Oneida Ltd.*, 209 Ga 613, 75 SE2d 161, 165; *Harris v. Duncan*, 208 Ga 561, 67 SE2d 692.

In *Harris v. Duncan*, supra, at page 693 of 67 SE2d, the Georgia court quoted with approval from the dissenting opinion in *Holcombe v. Georgia Milk Producers Confederation*, 188 Ga 358, 3 SE2d 705, as follows:

"* * * The right to contract is a property right which is protected by the due-process clauses of our State and Federal Constitutions, which can not be abridged by mere legislative act. * * * To allow abridgment * * * by taking from them the right to agree upon the price, would be to put legislation, whether enacted in exercise of claimed general or police power of the legislature, above the constitution. In this view so much of the act in question [Milk Control Act] as attempts to fix the price * * * is void as violative of the due-process clauses of the State and Federal constitutions."

In *Liquor Store v. Continental Distilling Corp.*, 40 So2d 371, the Florida Supreme Court in an exhaustive and well-reasoned opinion held the Fair Trade Act unconstitutional as it applied to nonsigners. We might well adopt the entire opinion of the Florida court as our opinion in this case. Among other things, the Florida court, at page 375 of 40 So2d, said:

"Our conclusion is that the act is arbitrary and unreasonable and violates the right to own and enjoy property; one economic group may not have the sovereign power of the state extended to it and use it to the detriment of other citizens. In that case the legislation serves a private rather than a public purpose. The sovereign power must not be delegated to a private citizen to be used for a private purpose and especially where there is no state supervision."

In the following words, the Florida court also subscribed to the same principles we adhered to in *Christian et al. v. La Forge*, supra:

"This statute is, in fact, a price fixing statute. The power to fix the price is vested in an interested person who is not an official. There is no review of his act. He is required to consult with no one and in no sense is required to take into consideration the cost of the article or the reasonableness thereof. \* \* \* *Throughout all our holdings we have recognized as basic that for a statute such as this to be upheld there must be some semblance of a public necessity for the act and it must have some relation to the public health, morals or safety.*" (Italics ours.)

Also see *Miles Laboratories, Inc. v. Eckerk et al.*, 73 So2d 680 (Fla), decided in March, 1954.

In 1955 the Supreme Court of Arkansas had occasion to pass upon the validity of the Fair Trade Act as it applied to nonsigners. *Union Carbide and Carbon*

*Corp. v. White River Distributors, Inc.*, 275 SW2d 455. The court held the act unconstitutional. We quote from that decision the following:

"The right of appellee [nonsigner] to sell its own property at a price agreeable to it is a right guaranteed by the Constitution since it is a valuable property right. That such right to sell is a valuable property right cannot be denied. * * *.

"Since the 'valuable property right' belonging to appellee is guaranteed by the constitution and has not been contracted away, it is axiomatic, or it is at least not questioned by appellant, that the legislature has no right by an enactment to take it away unless it has the right by virtue of its inherent police power, and then only to protect the public welfare. This principle is so well established by our courts that citations would appear useless * * *.

"Considering the Act in relation to this particular case, it virtually gives appellant the absolute right to fix the price at which Prestone must be sold to the consuming public in Arkansas without regard to the cost of manufacture or distribution. We are not forgetting that it must first contract with one retailer in the state and appellee must have knowledge of contract and the fixed price, but these provisions consist more of form than substance and merely indicate a desperate attempt to hedge against the charge of unconstitutionality. Nobody doubts the feasibility of appellant acquiring one contract dealer out of the hundreds of retail dealers in the state, or the feasibility of bringing this information to all other dealers. If securing a contract with one dealer binds all others, then the corollary would be that, absent such contract, the others are not bound. It is frightful to think a device so easily concocted could destroy the constitutional bulwark protecting our personal liberties and the public welfare.

"* * * * *

"Full and free competition is the long recognized basis of our economy. Trade-marked articles com-

prise a large number of the commodities in common use today and it is common knowledge that the number is increasing. There is nothing in the Act to limit the extent of increase. We can think of no way in which the public welfare was being jeopardized under the system of free competition prior to 1937 which suggested the necessity or advisability of imposing the restrictions contained in Act 92, and we can think of none that exists today. To the contrary, we believe it is generally recognized that the interest of the public is best served by the opportunity to buy commodities in a freely competitive market. We recognize that competition is preserved to a degree under the provisions of the Act, but it must be admitted that it is also restricted to a degree. The Act can be sustained only if it enhances the general welfare and not if it restricts it to only a small extent.

"We are not unmindful of the fact that a trademark has value which is entitled to protection, as is recognized in many cases cited by appellant. The answer to this contention is that appellant's trademark had ample protection prior to the enactment of any Fair Trade Act, and Act 92 gives it additional protection [by contract] even though Section 6 be deleted. Appellant has no right to expect additional protection if it is at the expense of the general welfare."

We are convinced that the Fair Trade Act as it applies to nonsigners constitutes an unnecessary and unreasonable interference with an individual's constitutional right of contract and of property in violation of Art I, § 20, of the Oregon Constitution, and of the due process clause of the federal constitution. *Christian et al. v. La Forge*, supra. However, assuming but in no sense deciding that the legislature itself might fix the minimum prices, we are of the opinion that the Act also contains an attempted unconstitutional dele-

gation of legislative power in violation of Art I, § 21, Oregon Constitution, supra.

In *Van Winkle v. Fred Meyer, Inc.*, 151 Or 455, 460, 463, 49 P2d 1140, we held unconstitutional, as an attempt to make an unlawful delegation of legislative authority, a statute which empowered the governor to approve marketing agreements entered into by persons representing a substantial majority of the volume, measured in dollars or unit of output, of the intrastate business within this state of a particular industry or subdivision thereof, and declaring that the provisions of any agreement so approved should constitute the legal standards of fair competition and fair trade practices for the industry covered by the agreement. In discussing the statute, Mr. Justice RAND, in speaking for the court, said:

"It will thus be seen that, with the exception of persons engaged in manual labor and selling the products of their labor, the purpose of the act is to subject all persons engaged in the business or industry covered by the act to marketing agreements having the force and effect of law, whether they have assented thereto or not, for a violation of which their goods may be forfeited and they themselves become subject to criminal prosecution, against which, if the law is valid, they can make no defense. * * * Under these provisions, a preponderant majority engaged in any particular line or branch of industry or business covered by the act may, with or without the assent of the others likewise engaged, fix the price of any commodity covered by the agreement and limit and restrict the amount which may be produced or sold. In granting these coercive and unrestrained powers to an indefinite and indeterminate group of persons the act contains no limitation or restriction upon the exercise by them of the powers so conferred, nor does it prescribe any definite or intelligible rule,

standard or guide by which their exercise of such powers is to be governed or their discretion controlled, and leaves wholly to such majority the determination of whether there shall be a law at all and, if there is to be a law, what the terms thereof shall be.''

At page 463 of 151 Or, we find a statement which we believe to be determinative of the issue now under consideration. We said:

"Under the very terms of the act in question, there is to be no law fixing the price of any commodity unless a preponderant majority [unless a manufacturer formulates an agreement with a retailer, etc.] engaged in its production or sale formulate an agreement and secure its approval by the governor. [Under the Fair Trade Act an agreement only is necessary.] Under the specific directions of the act, when this has been done, the *prices so fixed* and the regulations so adopted *are to become the law of the state,* but *if no agreement is entered into, then there is to be no law.* [It takes an agreement between private persons to make the Fair Trade Act operative.] This leaves wholly to persons outside of the legislature the power to determine whether there shall be a law at all and, if there is to be a law, what the terms of that law shall be. *It is impossible to conceive of a more complete delegation of legislative power* and, since the act contravenes the plain provisions of our constitution in that it attempts to make an unlawful and unauthorized delegation of legislative power, the act is unconstitutional and void.'' (Italics ours.)

In *La Forge v. Ellis,* 175 Or 545, 154 P2d 844, we had before us for consideration a statute fixing minimum prices for barber services. Mr. Justice Lusk, in speaking for the court, held the law unconstitutional and void as constituting an unlawful and unauthorized delegation of legislative power. He based the decision

upon *Van Winkle v. Fred Meyer, Inc.,* supra, quoting
therefrom the above, saying: "The case is governed by
*Van Winkle v. Fred Meyer, Inc.,* 151 Or 455, 49 P2d
1140." The question raised as to due process was not
decided in *La Forge v. Ellis.*

Following this decision, the legislature amended
the barber price-fixing Act in an attempt to meet the
constitutional objections as to an unlawful delegation
of legislative power. Oregon Laws 1945, ch 198. In
1952 this amended Act came before this court for con-
sideration. *Christian et al. v. La Forge,* supra. We
held the Act unconstitutional and void. In concluding
our opinion, we said:

> "However, we are of the opinion that preserva-
> tion of the individual's constitutional right of con-
> tract and of property without unnecessary and un-
> reasonable interference is of the utmost importance
> to the public welfare in general. The act under con-
> sideration in this case unreasonably and unneces-
> sarily interferes with and restricts defendant's
> constitutional right to carry on his business and to
> render his services at prices suitable to himself, and
> is, therefore, unconstitutional and void."

■ On the question of delegation of power we see no
substantial difference between the Fair Trade Act and
the statutes under consideration in both the *Van Winkle
v. Meyer, Inc.,* and *La Forge v. Ellis* cases. Under the
Fair Trade Act authority is delegated to the owner
of a trademarked commodity to determine whether the
provisions of the law shall be put into effect and op-
eration as to such commodity, just as authority
was delegated to a majority of producers to fix prices
under the statute involved in the *Van Winkle v. Meyer,
Inc.,* case and to 70 per cent of the barbers to fix prices
under the statute discussed in *La Forge v. Ellis,* supra.
By his own act in entering into a contract with a single

retailer, the trademark owner may fix the price for all retailers. Without regard to the interests or welfare of the nonsigners, and without their consent, he may change the price at will, or even terminate the contract ending the operation of the statute as to his commodity. It is solely up to him to say whether or not there shall be a law controlling the price at which his article of trade shall be sold. Could there possibly be a more flagrant violation of the constitutional provision respecting the delegation of legislative power than is attempted by the Fair Trade Act? We think not. See *Demers v. Peterson,* 197 Or 466, 254 P2d 213. Under no circumstances is the legislature empowered to delegate to a private person for private benefit the power to fix minimum resale prices binding upon parties with whom he has no direct contractual relationship; in some cases where the public health, safety, and welfare demands, it might perhaps lawfully delegate such power to a public administrative body, provided proper standards to guide and control the actions of such agency are provided in the law, but not otherwise.

We are aware of the fact that several state courts of last resort have held the Fair Trade Act constitutional as applied to nonsigners. Most of them based their conclusions upon the holding of the United States Supreme Court in the Old Dearborn case. A few dealt with the question of due process and an unlawful delegation of legislative power under their own state constitutions. We cite as examples of those decisions: *General Electric Co. v. Klein,* 106 A2d 205; *Goldsmith v. Meade-Johnson & Co.,* 176 Md 474, 7 A2d 176; *Hulzler Bros. Co. v. Remington-Putnam Book Co.,* 46 A2d 102; *General Electric Co. v. Masters, Inc.,* 307 NY 229, 120 NE2d 802; *General Electric Co. v. Klein,* 121 NYS2d 37; *Miles Laboratories v. Owl Drug Co.,*

67 SD 523, 295 NW 292; *Weco Products Co. v. Reed Drug Co.*, 225 Wis 474, 274 NW 426. Most of those cases were decided prior to the decision of the United States Supreme Court in the Schwegmann case, but not all of them.

In *General Electric Co. v. Klein*, supra, the New York Supreme Court discussed delegation of power. It said:

"* * * As pointed out in Old Dearborn Distributing Co. v. Seagram Distillers Corp., 299 U.S. 183, 192, 57 S. Ct. 139, 81 L. Ed. 109, the statute does not attempt to fix prices, nor does it delegate such power to private persons. It permits designated private persons to contract with respect thereto, but contains no element of compulsion and leaves the parties free to enter into such contracts or not as they may see fit."

The court apparently paid little heed to the forceful language employed by Mr. Justice Douglas in the Schwegmann case about price-fixing as concerned non-signers; it simply repeated what was said in the Old Dearborn case. The New York court continued thus:

"True, of course, the statute then goes on and, in effect, makes the contract, when made, obligatory upon non-signing, non-agreeing retailers; but it does that by the direct command of the legislature itself that wilfully and knowingly selling at less than the prices stipulated in such contract is unfair competition, actionable by anyone damaged thereby. *There certainly is no delegation of legislative power in that.* It is the legislature itself which lays down the policy, the rule, and the standard of conduct it intends shall prevail. *It does not delegate anything to anyone.*" (Italics ours.)

The Wisconsin Supreme Court in *Weco Products Co. v. Reed Drug Co.*, supra, decided in 1937, followed somewhat the same line of reasoning as that quoted

from the New York case, supra. We are of the opinion that both the New York and Wisconsin courts take an unrealistic view of the statute and its operation. This also is true of the United States Supreme Court in its decision in the Old Dearborn case. To say that the statute does not attempt to fix prices insofar as non-signers are concerned is to deny the obvious. What does the statute operate upon when it seeks to declare nonsigning vendors guilty of unfair competition? Manifestly, it is a fixed price established by a private person, below which the nonsigner must not sell if he is to be free from the charge and consequences of unfair competition. The private person must first fix the price by which the nonsigner is to be bound; when that price is set it becomes the fixed price as to him. The legislature then adopts that fixed price as the basis for judging the conduct of a nonsigner from the standpoint of unfair competition. *There can be no unfair competition under the Act unless and until a minimum resale price is fixed in the manner provided by the law.* If the power of the owner of a trademarked commodity to set the price at which a nonsigner must sell if he is to avoid violating the statute is not the power to fix prices, then what is it? It would seem unnecessary to elucidate the obvious, but it is manifest that the Supreme Court of the United States in the Old Dearborn case, together with the New York and Wisconsin courts, and other courts following their reasoning, have overlooked the substance of the statute; they have adhered to its form.

Fully recognizing the fact that the several courts are not in complete accord upon the questions involved and discussed in this opinion, nevertheless, we are of the opinion that the better reasoning and logic are to be found in those decisions which have declared the

Fair Trade Act unconstitutional and void as being in violation of state constitutional provisions similar to those of this state.

We hold that the Fair Trade Act (ORS 646.310 to 646.370) of this state, as it applies to nonsigners of Fair Trade contracts entered into pursuant to its provisions, is unconstitutional and void, being in violation of Art I, § 20, and Art I, § 21, of the constitution of this state.

The decree of the trial court is affirmed. Defendant shall recover costs.

LUSK, J., specially concurring.

I concur in the result of the court's opinion, and will briefly state my views as to the ground upon which I think the decision should be based.

Since the case of *Nebbia v. New York*, 291 US 502, 78 L ed 940, 54 S Ct 505, 89 ALR 1469, it has not been open to question that legislative price fixing is not a violation of the Due Process Clause of the Federal Constitution unless it is unreasonable or arbitrary. That case established the constitutionality of the Milk Control Law of the state of New York under which a board governed by appropriate standards was authorized to fix minimum and maximum prices for milk. It was contended that a law which attempted to control prices in a private business was a violation of due process. The court, in an elaborate opinion by Mr. Justice Roberts, rejected the contention and specifically refused to yield to the argument that such legislation could be sustained only with relation to "businesses affected with a public interest," that is to say, "such as is commonly called a public utility; or a busi-

ness in its nature a monopoly." The court concluded its discussion of the question by saying:

"*  *  * The Constitution does not secure to anyone liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty." 291 US at pp 538, 539.

In *Savage v. Martin,* 161 Or 660, 91 P2d 273, this court followed the decision in the Nebbia case.

If, therefore, the only objection to the Fair Trade Act were that it is a price-fixing measure, I should be inclined to hold, if it were necessary to reach the question, that the court could not say that "it is demonstrably irrelevant to the policy the legislature is free to adopt," and, therefore, that it does not violate due process.

I have no doubt whatever that the Maguire Act, 15 USCA ('55 P P) § 45, supplied the defect in the Miller-Tydings Act (15 USCA § 1) with respect to nonsigners pointed out in *Schwegmann Brothers v. Calvert Distillers Corp.,* 341 US 384, 95 L ed 1035, 71 S Ct 745, 19 ALR2d 1119, and, therefore, that the provisions of the Oregon Fair Trade Act are no longer in conflict with the Sherman Act so far as nonsigners are concerned. But the question remains whether the Act, as applied to nonsigners, constitutes an unlawful delegation of legislative authority to private individuals. I agree with the conclusion in the opinion of Mr. Justice Tooze that it does and that in that respect the law is unconstitutional.

This view, it would seem, is in conflict with what was decided by the Supreme Court of the United States in *Old Dearborn Distributing Co. v. Seagram Distillers Corp.*, 299 US 183, 81 L ed 109, 57 S Ct 139, in which the Fair Trade Act of Illinois was sustained. The objection of unlawful delegation of legislative authority to private individuals was considered in that case and disposed of by stating that voluntary acquisition of the property by nonsigners "carried with it, upon every principle of fair dealing, assent to the protective restriction." 299 US at pp 193, 194. But the Schwegmann case, although it dealt with the construction of the Miller-Tydings Act, not its constitutionality, nevertheless has cut the ground from under the Old Dearborn case by holding that when a distributor and one or more retailers seek to impose price fixing on persons who have not contracted or agreed to the scheme, "that is price fixing by compulsion" (341 US at p 388), and by characterizing legislation authorizing such conduct as "blanketing a state with resale price fixing if only one retailer wanted it" (341 US at p 390), and "a program whereby recalcitrants are dragged in by the heels and compelled to submit to price fixing." Id. See, also, Lambert Pharmacal Co. v. Roberts Bros., 192 Or 23, 233 P2d 258.

The vigorous language of Mr. Justice Douglas which we have quoted from the Schwegmann opinion was used for the purpose of demonstrating that the provisions of State Fair Trade Acts, which attempted to bring nonsigners within the sweep of the law, had not been sanctioned by the Miller-Tydings Act. This language accurately described such provisions as compulsory price fixing and discarded the implied-assent theory of the Old Dearborn case without mentioning that case by name. At the same time it undermined the

authority of Old Dearborn upon the question of unlawful delegation of legislative authority.

It is, of course, obvious that the provisions in question do not mean something different now from what they meant when the Schwegmann case was decided. The Maguire Act has not changed their meaning, but has only given them congressional sanction with respect to the Sherman Act . They were compulsory price-fixing provisions when the Schwegmann opinion was written, and they are still compulsory price-fixing provisions.

It, therefore, appears that the Oregon Fair Trade Act has attempted to vest in a distributor in combination with one or more retailers the authority to fix the resale price of certain commodities. The fact that the commodities are identified by a trade-mark, brand, or the name of the owner or distributor, is irrelevant to the present question. It is none the less price fixing, determined not by the legislature itself, nor by a board or commission acting under legislative authority, but by private individuals. Such a provision is as fully obnoxious to the Oregon Constitution (Art I, § 21; Art III, § 1; Art IV, § 1) as the law establishing minimum prices for barber services which we struck down in *La Forge v. Ellis,* 175 Or 545, 174 P2d 844, and the law authorizing private individuals to fix the price of agricultural products held unconstitutional in *Van Winkle v. Fred Meyer, Inc.,* 151 Or 455, 49 P2d 1140.

It is on this ground alone that I concur in the opinion of the court.

The Chief Justice and Mr. Justice BRAND join in the foregoing opinion.