17341

ROGERS-KENT, INC., Respondent, v. GENERAL ELECTRIC COMPANY, Appellant

(99 S. E. (2d) 665)

*Messrs. Boyd, Bruton & Lumpkin* and *J. B. S. Lyles,* of Columbia, *for Appellant,*

638

*Isadore S. Bernstein, Esq.,* of Columbia, *for Respondent.*

*Messrs. Boyd, Bruton & Lumpkin* and *J. B. S. Lyles,* of Columbia, *for Appellant, in Reply,*

*Messrs. P. H. Nelson* and *Nelson, Mullins & Grier,* of Columbia, *for Pharmaceutical Association of the State of South Carolina, as amicus curiae,*

August 26, 1957.

OXNER, Justice.

This action was brought under the Uniform Declaratory Judgments Act, Volume 1, Title 10, Chapter 24 of the 1952 Code, to determine the constitutionality of our "Fair Trade Act", sections 66-91 to 66-95, inclusive, of the 1952 Code.

This legislation was enacted in 1937. 40 St. at L. 301. It was entitled "An Act to Protect Trade Mark Owners, Distributors and the Public Against Injurious and Uneconomic Practices in the Distribution of Commodities Under a Distinguishing Trade Mark, Brand or Name."

Section 66-93, so far as material to our discussion, reads:

"No contract relating to the sale or resale of a commodity which bears, or the label or container of which bears, the trademark, brand or name of the producer, distributor or owner of such commodity and which is in fair and open competition with commodities of the same general class produced by others shall be deemed in violation of any law of the State by reason of any of the following provisions which may be contained in such contract:

"(1) That the buyer will not resell such commodity at less than the minimum price stipulated by the vendor or

"(2) That the producer or vendee of a commodity require upon the sale of such commodity to another that such purchaser agree that he will not, in turn, resell at less than the minimum price stipulated by such producer or vendee."

Section 66-94 is as follows:

"Willfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract containing either of the provisions mentioned in § 66-93, whether the person so advertising, offering for

sale or selling is or is not a party to such contract, is unfair competition and is actionable at the suit of any person damaged thereby."

The Court below held the Act unconstitutional upon the grounds (1) That it was void in its inception because inconsistent with the Sherman Anti-Trust Act, 15 U. S. C. A. §§ 1-7, 15 note, as it then stood and the subsequent passage of permissive Federal legislation could not impart validity to it; (2) that it violated the due process and equal protection clauses of Article 1, Section 5 of our Constitution; and (3) that it was an unlawful delegation of legislative power to private individuals contrary to Article 3, Section 1.

The facts were agreed upon. General Electric Company, defendant below and appellant here, manufactures and sells on a national scale many products, including small electrical appliances such as clocks, automatic blankets, fans, heating pads and vacuum cleaners, all of which bear its trade mark "General (GE) Electric." They are shipped from the places of manufacture to wholesale distributors who in turn sell said appliances to, amongst others, retail dealers throughout the United States. They are sold in this State in free and open competition with appliances of the same general class produced by others. General Electric has expended large sums in promoting and advertising these products and has established a valuable reputation and good will for them and its trade mark. It guarantees them against defects in material and workmanship and replaces or repairs any appliances becoming defective within the time limits specified in the guarantee. Since July, 1952, pursuant to the provisions of our Fair Trade Act, General Electric has from time to time entered into written agreements with a substantial number of retail dealers in South Carolina under which it has stipulated the minimum retail sale prices for its appliances.

Rogers-Kent, Incorporated, plaintiff below and respondent here, is a South Carolina corporation engaged in a general retail mercantile business. It sells numerous articles

bearing nationally known trade marks, including small appliances made by General Electric. It has not entered into any contract with General Electric under the Fair Trade Act and has sold its products from time to time below the retail price specified in the contracts made by General Electric with other retail dealers in this State. Although notified in January, 1955 of the form and existence of such contracts and the minimum retail prices therein specified, it has continued to advertise, offer for sale and sell at retail, appliances bearing the trade-mark of General Electric at prices lower than those stipulated in the agreements made by General Electric with other dealers.

The record does not disclose the source from which Rogers-Kent obtains General Electric products. Presumably they were purchased from recognized dealers or direct from General Electric Company. Be that as it may, there is no contention that Rogers-Kent was guilty of fraud or deception in acquiring these appliances.

The depression following 1929 gave impetus to the movement for legislation which would allow the fixing of minimum resale prices. California was the first State to adopt a Fair Trade act. It did so in 1931. Originally it applied only to those who signed the agreements. In 1933 the California statute was amended, making the contracts binding on all retailers who had knowledge of same, even though they had not signed such contracts. Within a few years most other States followed suit. All the acts contain provisions substantially the same as those embodied in the California act. It appears that 45 States have now enacted Fair Trade legislation.

At the time of the pasage of our Act in 1937, it was unconstitutional as applied to interstate commerce. *Old Dearborn Distributing Company v. Seagram-Distillers Corp.,* 299 U. S. 183, 57 S. Ct. 139, 81 L. Ed. 109. On August 17, 1937, in an attempt to change the rule announced in the above case, Congress passed the *Miller-Tydings Act,* 15 U. S. C. A. § 1. In *Schwegmann Bros. v. Calvert Distillers*

*Corp.,* 341 U. S. 384, 71 S. Ct. 745, 95 L. Ed. 1035, it was held that the Miller-Tydings Act applied only to cases where the parties litigant had entered into contracts made under State fair trade laws and had not amended the Sherman Act to such an extent as to permit an action against non-signers. Later, in an effort to obviate the effect of the ruling in the *Schwegmann case,* the so-called McGuire Act was adopted by Congress, 15 U. S. C. A. § 45. This had the effect of extending the Miller-Tydings Act to non-signers. The result is that it is now generally held that no Federal constitutional difficulty exists in enforcing State fair trade laws.

The constitutionality of such legislation has been considered by approximately half the courts of last resort of the States adopting fair trade statutes. They have been upheld by a majority of these courts. *Burroughs Wellcome & Co. v. Johnson Wholesale Perfume Co.,* 128 Conn. 596, 24 A. (2d) 841; *Max Factor & Co. v. Kunsman,* 5 Cal. (2d) 446, 55 P. (2d) 177; *General Electric Co. v. Klein,* Del., 106 A. (2d) 206; *Goldsmith v. Mead Johnson & Co.,* 176 Md. 682, 7 A. (2d) 176, 125 A. L. R. 1339; *W. A. Sheaffer Pen Co. v. Barrett,* 209 Miss. 1, 45 So. (2d) 838; *Johnson & Johnson v. Weissbard,* 121 N. J. Eq. 585, 191 A. 873; *Bourjois Sales Corp. v. Dorfman,* 273 N. Y. 167, 7 N. E. (2d) 30, 110 A. L. R. 1411; *Ely Lilly & Co. v. Saunders,* 216 N. C. 163, 4 S. E. (2d) 528, 125 A. L. R. 1308; *Burche Co. v. General Electric Co.,* 382 Pa. 370, 115 A. (2d) 361; *Miles Laboratories, Inc., v. Owl Drug Co.,* 67 S. D. 523, 295 N. W. 292; *Frankfort Distillers Corp. v. Liberto,* 190 Tenn. 478, 230 S. W. (2d) 971; *Sears v. Western Thrift Stores of Olympia, Inc.,* 10 Wash. (2d) 372, 116 P. (2d) 756; *Weco Products Co. v. Reed Drug Co.,* 225 Wis. 474, 274 N. W. 426; *Seagram-Distillers Corp. v. Old Dearborn Distributing Co.,* 363 Ill. 610, 2 N. E. (2d) 940; *General Electric Co. v. Kimball Jewelers, Inc.,* 333 Mass. 665, 132 N. E. (2d) 652.

A number of states, admittedly a minority in number, have on various grounds stricken down such statutes. *Liquor*

*Store, Inc., v. Continental Distilling Corp.,* Fla., 40 So. (2d) 371; *Cox v. General Electric Co.,* 211 Ga. 286, 85 S. E. (2d) 514; *Shakespeare Co. v. Lippman's Tool Shop Sporting Goods Co.,* 334 Mich. 109, 54 N. W. (2d) 268; *McGraw Electric Co. v. Lewis & Smith Drug Co.,* 159 Neb. 703, 68 N. W. (2d) 608; *Union Carbide & Carbon Corp. v. White River Distributors, Inc.,* 224 Ark. 558, 275 S. W. (2d) 455; *Olin Mathieson Chemical Corp. v. Francis,* 134 Colo. 160, 301 P. (2d) 139; *General Electric Co. v. Wahle,* 207 Or. 302, 296 P. (2d) 635; *Dr. G. H. Tichenor Antiseptic Co. v. Schwegmann Bros. G. S. Mkts.,* 231 La. 1, 90 So. (2d) 343.

In *General Electric Co. v. Thrifty Sales,* 5 Utah (2d) 326, 301 P. (2d) 741, 750, the Court said: "It is significant that after some years of experience under the acts and numerous comprehensive studies covering the economic effects, the administration, and the enforcement of such laws, the majority of the more recent decisions have declared the acts invalid. Since 1952, of the jurisdictions considering the issue for the first time, only four states have upheld them, while eight have found them unconstitutional."

Most of the State decisions holding the fair trade laws unconstitutional are based primarily on the ground that as applied to non-signers, such legislation constitutes a deprivation of property without due process of law. We are in accord with this view. We rest our decision upon the due process clause of Section 5, Article I of the Constitution of South Carolina.

"Property in a thing consists not merely in its ownership and possession, but in the unrestricted right of use, enjoyment, and disposal. Anything which destroys one or more of these elements of property to that extent destroys the property itself." *Gasque v. Town of Conway,* 194 S. C. 15, 8 S. E. (2d) 871, 873. Also, see *Henderson v. City of Greenwood,* 172 S. C. 16, 172 S. E. 689.

The right of an owner of property to fix the price at which he will sell is an inherent attribute of the property itself. *Tyson & Bro. v. Banton,* 273 U. S. 418, 47 S. Ct. 426, 71 L. Ed. 718; *Charles, Wolff Packing Co. v. Court of Industrial Relations,* 262 U. S. 522, 43 S. Ct. 630, 67 L. Ed. 1103; *Williams v. Standard Oil Co.,* 278 U. S. 235, 49 S. Ct. 115, 73 L. Ed. 287; *New State Ice Co. v. Leibmann,* 285 U. S. 262, 52 S. Ct. 371, 76 L. Ed. 747.

This legislation can be justified only upon the theory that it constitutes a reasonable and proper exercise of the inherent police power of the State. We have held that such power can only be exercised where it is reasonably necessary in the interests of the public order, health, safety, morals or general welfare. *Gasque, Inc. v. Nates,* 191 S. C. 271, 2 S. E. (2d) 36; *McCoy v. Town of York,* 193 S. C. 390, 8 S. E. (2d) 905.

It is difficult to find any justification for this legislation based upon considerations of the public health, safety, morals and general welfare. It applies to every product bearing the trade-mark, brand or name of the producer. No distinction is made between commodities affected with a public interest and those that are not. Under the terms of the act, a non-signer has no voice whatsoever in fixing the price at which he may sell his property. By entering into a contract with a single retailer, the trade-mark owner may fix the price for all retailers, without regard to their interests or welfare. The manufacturer is not required to take into consideration the cost of his article. He may change the retail prices at will, or even terminate the contract and remove any article from the operation of the statute. It is solely up to him to say whether or not there shall be a law controlling the price at which his trade-marked article shall be sold. There is no review of his acts. In *Cox v. General Electric Company, supra,* 211 Ga. 286, 85 S. E. (2d) 514, 519, the Court said:

"We are also familiar with the modern trend to allow the government to encroach more and more upon the individual liberties and freedoms. So far as we are concerned we will

not strike down the Constitution of our State for this purpose; neither will we follow the crowd. The scheme described in the petition now under consideration permits a manufacturer, under the guise of protecting his property rights in a trade name and trade-mark, to control the price of his product down through the channels of trade into the hands of the ultimate consumer, and into the hands of persons with whom he has no contractual relation whatever. This statute clearly violates the provisions of the due-process clause of the Constitution of the State of Georgia."

We have not overlooked the fact that it was held in *Old Dearborn Distributing Co. v. Seagram-Distillers Corp.*, *supra*, 299 U. S. 183, 57 S. Ct. 139, 144, 81 L. Ed. 109, that the non-signer provision of the fair trade laws did not work a denial of due process of law or the equal protection of the laws guaranteed by the Fourteenth Amendment. This apparently settles the matter in so far as the Federal Constitution is concerned but does not control us in the interpretation of our own Constitution. The *Old Dearborn case* was predicated upon the assumption that non-signers had consented to the arrangement and was based on the premise that the manufacturer has a property right in his trade-mark as distinguished from the physical thing, the product. The Court said:

"Appellants here acquired the commodity in question with full knowledge of the then existing restriction in respect of price which the producer and wholesale dealer had imposed, and, of course, with presumptive if not actual knowledge of the law which authorized the restriction. Appellants were not obliged to buy; and their voluntary acquisition of the property with such knowledge carried with it, * * * assent to the protective restriction, with consequent liability under section 2 of the law by which such acquisition was conditioned."

"We are here dealing not with a commodity alone, but with a commodity plus the brand or trade-mark which it bears as evidence of its origin and of the quality of the

commodity for which the brand or trade-mark stands. Appellants own the commodity; they do not own the mark or the good will that the mark symbolizes."

"The ownership of the good will, we repeat, remains unchanged, notwithstanding the commodity has been parted with. Section 2 of the act does not prevent a purchaser of the commodity bearing the mark from selling the commodity alone at any price he pleases. It interferes only when he sells with the aid of the good will of the vendor; and it interferes then only to protect that good will against injury. It proceeds upon the theory that the sale of identified goods at less than the price fixed by the owner of the mark or brand is an assault upon the good will, and constitutes what the statute denominates 'unfair competition.' * * * There is nothing in the act to preclude the purchaser from removing the mark or brand from the commodity—thus separating the physical property, which he owns, from the good will, which is the property of another—and then selling the commodity at his own price, provided he can do so without utilizing the good will of the latter as an aid to that end."

Most of the State decisions upholding fair trade legislation are bottomed upon the *Old Dearborn case* but we do not think the theory upon which that case was decided is sound. We find no basis for implied consent on the part of non-signers. A trademark or brand is not in the nature of a covenant running with property. Nor do we agree with the premise that a manufacturer or producer who has sold his trademarked article for full value, completely parted with possession and title, and placed it in the channels of trade, still retains some property interest which enables him to control the selling price in perpetuity. It is difficult to see how he can sell his cake and have it, too. We are impressed with the following from the dissenting opinion of Judge Holmes in *Schwegmann Bros. Giant Super Markets v. Eli Lilly & Co.,* 5 Cir., 205 F. (2d) 788, 797:

"Trade-mark and good will are not synonymous terms; but the Old Dearborn opinion says: 'Appellants own the

commodity; they do not own the mark or the good will that the mark symbolizes.' The court ignored the fact that the producer put its name and mark on the container (sometimes on the product) and launched it in commerce. The court said that there was nothing to prevent a purchaser from selling the commodity alone at any price, and nothing to preclude a purchaser from removing the mark or brand and then selling the commodity at his own price, with a vague proviso that the good will of the producer must not be used to aid the sale. This proviso must be distinguished from the three statutory conditions wherein sales are excepted from minimum price agreements. The statutory exceptions are not involved here, and the Old Dearborn opinion maintains that the retailer may separate the physical property, which he owns, from the good will of the manufacturer's business, which is the property of another, and then sell the commodity at his own price, provided, etc. The court says ownership of the good will 'remains unchanged, notwithstanding the commodity has been parted with'; and then it says that the fair-trade statute interferes 'only to protect that good will against injury.' Let us now ascertain what physical property was sold by the appellee, and what incorporeal property was retained by it.

"The appellants bought more than the loose, disattached, commodity; they bought the package, bottle, or container, in which it was delivered, with the inscriptions on the same. This tangible property was put into the channels of trade by the producer, and title to it passed to the retailers; but the latter acquired nothing intangible, like the good will of the vendor's business, or the right to use the trade mark on other commodities sold by them. No covenants ran with the sale of the merchandise like covenants sometimes run with the land conveyed. The doctrine of *caveat emptor* did not require the buyers to beware of price-fixing agreements between the vendor and some other retailer. If the appellants made no contract, they did not need to underwrite the covenants of their competitors. A trade mark is not always evi-

dence of good quality or symbolic of good will; but ordinarily is only representative of the origin of a commodity or the identity of its maker. Marks that simply indicate the quality of articles do not constitute a valid trade mark, and no property may be acquired therein.

"We have here sales, for the purpose of resale, of commodities in trade-marked containers; and it was not unfair competition, injurious to the producer's good will, for retailers who had agreed to no prices to resell the same commodities in the same containers at their own prices without defacing the trade mark. Without mentioning the practical impossibility of removing the trade mark from all aspirin tablets and from all the containers of drugs in stock, there are state and federal statutes forbidding the obliteration or concealment of trade marks, and even requiring the display of the manufacturer's, packer's, or distributor's name on drugs."

We think the authority of the *Old Dearborn case* was somewhat weakened by the later decision of the United States Supreme Court in *Schwegmann Bros. v. Calvert Distillers Corp., supra,* 341 U. S. 384, 71 S. Ct. 745, 747, 95 L. Ed. 1035, where the Court frankly characterized the State fair trade statutes as involving price fixing against non-signers. It was there stated:

"If a distributor and one or more retailers want to agree, combine, or conspire to fix a minimum price, they can do so if state law permits. * * * When they seek, however, to impose price fixing on persons who have not contracted or agreed to the scheme, the situation is vastly different. That is not price fixing by contract or agreement; that is price fixing by compulsion. That is not following the path of consensual agreement; that is resort to coercion. * * * Contracts or agreements convey the idea of a cooperative arrangement, not a program whereby recalcitrants are dragged in by heels and compelled to submit to price fixing."

The modern trend is to regard this legislation as a price-fixing statute. In *General Electric Company v. Wahle, supra,* 207 Or. 302, 296 P. (2d) 635, 642, the Court said:

"Regardless of how its true nature may be camouflaged by high-sounding terms such as 'free and open competition', 'unfair competition,' 'protection of good will,' etc., it is a matter of common knowledge that it is a price-fixing statute designed principally to destroy competition at the retail level. Protection of the 'good will' of the trademark owner is simply an excuse and not a reason for the law. According to eminent writers in law reviews, pressure for the passage of these Acts came not from manufacturers or other trademark owners but from distributors—first and foremost the retail druggists associations and then other retail and wholesale distributors."

Having concluded that the statute in so far as it applies to non-signers, must be declared unconstitutional upon the grounds that it constitutes a deprivation of property without due process of law in violation of Article 1, Section 5 of the Constitution of South Carolina, we need not pass upon the other grounds upon which the lower Court rested its decision.

Affirmed.

STUKES, C. J., and TAYLOR, LEGGE and MOSS, JJ., concur.